**Billy MERRITT, Plaintiff-Appellant,**

**v.**

**Gordon H. FAULKNER, et al.,
Defendants-Appellees.**

**No. 86–2440.**

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1987.

Decided July 13, 1987.

Gary L. Flannigan, Starkman Avery Hodes, Costello, Burman, Chicago, Ill., for plaintiff-appellant.

Sabra A. Weliever, Office of Atty. Gen. of Indiana, Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS, CUDAHY and POSNER, Circuit Judges.

PER CURIAM.

This appeal involves a challenge to the validity of a settlement of an action brought pursuant to 42 U.S.C. § 1983 (1982). The district court found that the settlement agreement was valid and enforceable and that neither party had breached the agreement. We affirm.

I.

The plaintiff, Billy Merritt, brought a section 1983 suit alleging that certain prison officials acted with deliberate indifference to his serious medical problems while he was an inmate at Indiana State Prison. Merritt initially brought this suit *pro se,* but this court on an earlier appeal held that Merritt had the right to a court-appointed lawyer. *Merritt v. Faulkner,* 697 F.2d 761 (7th Cir.1983). Because the facts are set forth in that first appeal, we will repeat them here only to the extent necessary to evaluate the enforceability of the settlement agreement.

In July 1978, Merritt injured his left eye and complained of blurred vision to the officials of the Indiana State Prison where Merritt was an inmate. Several prison physicians examined Merritt, including the prison ophthalmologist who discovered a vitreous hemorrhage in Merritt's left eye. Approximately one month later, Merritt was diagnosed as having sickle cell disease, which the prison ophthalmologist believed was related to Merritt's eye condition. Approximately six months after the injury, Merritt was sent to an Indianapolis hospital for treatment of his left eye. The surgeons at the hospital performed a vitrectomy (an operation to remove fluid from the eye) on the right eye, even though there were apparently no medical problems with that eye. Merritt alleges that subsequently the vision in his right eye deteriorated and he became functionally blind in both eyes.

The district court held a status conference on August 20, 1985 which was attended by Merritt, his counsel Ernest Beal, and counsel for the state defendants. At that conference the parties informed the court that they had reached an agreement whereby the case could be settled. Beal described the agreement to the court as follows:

Working under permission given to me by the client—my client, Mr. Merritt, the State and I have made some agreements which, I believe, are acceptable to my

client which we believe will resolve the case.

One of the things that the State has agreed to do—and which I believe to be a very important part of the care and treatment for Mr. Merritt—is to make arrangements for the development of a treatment plan to deal with the current state of his visual condition and to deal with the future course of care.

We have talked among ourselves that the arrangements for and timetable for developing such a treatment plan ought to be something like 45 days from this date. We have talked about who should provide the direction for the development of that treatment plan, and the State has agreed to allow the University of Illinois Eye and Ear Infirmary, which performed the evaluation, to be the entity which develops the treatment plan; and it's my understanding that the arrangements will be made for them to do so.

The development of that treatment plan may or may not involve another visit by Mr. Merritt to their facilities. If it does, it's my understanding that we, the State and the plaintiff will allow this case to remain open, allow the Court to retain jurisdiction such that an application for habeas corpus relief may be granted, essentially at the parties' consent so that Mr. Merritt may be transferred by the marshals to that facility.

I understand that if there's a cost or expense associated with the care and treatment associated with the treatment plan, that that will be borne by the State.

It is understood that the treatment that will be required will be at the plaintiff's option, obviously. He has the right to refuse it if he chooses. If he elects to have treatment provided, it is understood that it will be provided by the medical providers contracted by, supplied by the Department of Corrections.

We have asked that the treatment plan include two ingredients at a minimum. One is a provision for annual visual examinations, and the other is a provision that such emergency care as is necessary will be provided when it's necessary.

The State has indicated that both of those conditions are reasonable and acceptable.

As an additional element of the resolution, we have agreed not to pursue and, indeed, to waive any claim for attorney's fees or costs associated with the representation of the plaintiff. Obviously, the State has accepted that offer.

And I think that represents the agreement of the parties.

*Merritt v. Faulkner,* No. S–80–207, at 3–5 (N.D.Ind. Aug. 21, 1985) (transcript of status conference).

After confirming with counsel for the defendants that Beal's description of the agreement was accurate, the district court judge made certain that Merritt understood and agreed with the terms under which the case was being settled:

THE COURT: All right. Mr. Merritt?

THE PLAINTIFF: Yes, your Honor.

THE COURT: You may remain seated.

I take it that you understood and heard all of Mr. Beal's remarks to me about the agreement that's generally been concluded between yourself and the State?

THE PLAINTIFF: Yes, sir, your Honor.

THE COURT: And do you understand that essentially the case is going to be settled, as I understand it, in consideration for the state providing you the opportunity to go to the Illinois facility and develop a treatment plan and then for the State to provide the medical services to you under that treatment plan?

THE PLAINTIFF: Yes, sir, your Honor.

THE COURT: And is that agreeable with you?

THE PLAINTIFF: Yes, sir, your Honor.

THE COURT: All right. Do you have any questions you want to ask me or Mr. Beal here in open court about the settlement?

THE PLAINTIFF: No, sir, your Honor.

*Id.* at 5–6.

Pursuant to this agreement, Merritt was examined on January 8, 1986 by Dr. Howard C. Charles at the University of Illinois Sickle Cell Eye Clinic (the "Eye Clin-

ic"). In his report based on that examination, Dr. Charles briefly reviewed the history of Merritt's vision condition. Although Merritt unquestionably suffers from some visual impairment, the precise extent of that impairment is unclear. During an examination performed at the Indiana School of Medicine on September 12, 1980, Merritt was found to have no light perception in both eyes; the diagnosis in that report was blindness of an undetermined etiology. Merritt first visited the University of Illinois Sickle Cell Eye Clinic on July 25, 1984, at which time he was examined by Dr. Ralph Paylor. Dr. Paylor found that Merritt had sickle cell disease, cataracts and a great deal of old vitreous hemorrhage in his left eye, and marked iris atrophy in both eyes. In addition, he found that Merritt had some light perception in both eyes. Dr. Paylor concluded that his examination revealed no "obvious reason for [Merritt's] level of visual dysfunction," but noted that the "lack of findings in the eyes itself do [sic] not preclude the possibility that the patient could be suffering from some disorder posterior to the eye that we are unable to see."

During the January 8, 1986 examination held pursuant to the settlement agreement, Dr. Charles found that Merritt's condition was unchanged from the time of the July 1984 visit. He stated, "[w]e still believe that based on the patient's ocular examination, the visual acuity should be much better than light perception with projection."[1] In a letter dated February 18, 1986, Dr. Charles summarized his findings based on Merritt's two examinations at the Eye Clinic. Dr. Charles concluded that Merritt's loss of vision is incurable and likely to be permanent, and he recommended annual eye examinations to prevent further vision loss:

[W]e believe that [Merritt's] vision loss is referable to choroidal and retinal ischemia based on sickle cell retinopathy.

There is no cure for this condition. Laser and surgical intervention is inappropriate. Because the changes involve the neural component of Mr. Merritt's retina, we suspect that any changes present are permanent.

We suggest annual ophthalmologic exams to prevent further loss of vision from some of the other stigmata of sickle cell retinopathy (i.e. retinal neovascularization). Given the extent of Mr. Merritt's visual loss, we doubt that a referral to a low vision specialist for telescopic or magnified glasses would help.

## II.

Merritt raises a number of related objections to the enforcement of the settlement agreement, including absence of a "meeting of the minds," indefinite contract terms, unilateral mistake and lack of consideration. Merritt argues that the settlement reached at the status conference was only a preliminary agreement, the terms of which are too indefinite to be enforceable. Merritt also claims that he believed that the "treatment" promised in the agreement "was more than a mere visit to a clinic for a determination that his condition was noncurable." Appellant's Brief at 21. He argues that "on the bottom line, [he] received essentially nothing for dismissing his case." Id. at 22.

We agree with the district court's determination (to which we show considerable deference) that the agreement reached was a final settlement agreement containing the following elements:

1. That Merritt would be sent to the University of Illinois Sickle Cell Eye Clinic in Chicago, Illinois, for an examination and the development of a treatment plan to deal with Merritt's vision condition;

2. That the Indiana Department of Corrections would arrange for the exami-

---

1. Dr. Charles also mentioned in his report that a Dr. Gerald Fishman had examined Merritt, but Dr. Charles did not have a copy of that report and thus did not comment on its findings. Dr. Fishman's report is dated August 13, 1984 and concluded, "Although the exact level cannot be quantitated with great certainty, the probability exists that vision in the left eye is either within normal limits or is only minimally reduced. Regardless, with his ability to discriminate colors and have excellent stereo acuity, the patient's vision cannot be hand motion or light perception. The level must be appreciably better."

nation in Chicago, and that the costs of the examination would be borne by the Department of Corrections;

3. That any treatment plan recommended by the Eye Clinic would be provided by the Department of Corrections through physicians chosen by the Department, and all costs of such treatment would be borne by the state;

4. That Merritt could refuse such treatment if he chose to;

5. That the Department of Corrections would provide Merritt with an annual examination and any emergency treatment as would be necessary;

6. Beal would waive all costs and fees incurred in the action; and

7. That Merritt would dismiss the action with prejudice.

*Merritt v. Faulkner,* No. S–80–207, at 2 (N.D.Ind. Aug. 13, 1986) (order). These settlement terms are sufficiently definite to be enforceable. And Merritt did gain something valuable from the settlement. He was guaranteed, among other things, an eye examination and the development of a treatment plan by the University of Illinois Sickle Cell Eye Clinic, a clinic that Merritt's attorney described as "the foremost facility in this country."

Merritt very likely did expect that the treatment plan he would be provided pursuant to the agreement would be more extensive than a single visit to the Eye Clinic and subsequent annual eye examinations. That initial visit, however, revealed that his blindness was incurable and no further treatment was available. The settlement agreement did not guarantee that Merritt's blindness would be cured, and Merritt could not have reasonably believed that it made that promise.

Now that his blindness has been diagnosed as incurable, Merritt may well regret having agreed to settle his suit as he did. Nonetheless, Merritt is bound by the terms of the settlement agreement. We therefore affirm the district court's dismissal with prejudice of this case.

AFFIRMED.

1. *See* V. Hugo, *Les Misérables* (1862).

CUDAHY, Circuit Judge, concurring:

Much could be said in response to Judge Posner's commentary on the blindness of judges, the iniquity of prisoners and the triviality of their concerns. Since the financial net worth of most prisoners is zero and their economic value while incarcerated perhaps less than zero, it is not surprising that efforts to take them seriously as human beings are sometimes scorned. They are not all Jean Valjean[1] but they are people.

I do not believe that Judge Swygert and I need apologize for the appointment of counsel for Merritt. *See Merritt v. Faulkner,* 697 F.2d 761 (7th Cir.1983). Counsel appears to have performed a real service in having Merritt referred to the leading sickle cell eye clinic in the Midwest to diagnose and prescribe for him. Whether Merritt is satisfied is not the point; those of us who have some responsibility in the matter can be assured that his eyesight is in good hands. I remain skeptical that the market could have assured an equivalent result. Somehow I doubt that we will ever find lawyers knocking on jail cell doors for business—even with the promise of a contingent fee. In any event, generalizations, drawn from Merritt's experience, about all prisoner civil rights litigation or about the efficiency of the prison litigation market are unwarranted. There is anecdotal "evidence" on all sides of the problem, *see, e.g., Wilson v. Lambert,* 789 F.2d 656 (8th Cir. 1986) (prisoner with court-appointed counsel prevailed on section 1983 claim and was awarded compensatory damages).

Nor am I as concerned as Judge Posner about the time we have "wasted" on Merritt. His problems seem to me to carry as much weight on the social scales as the concerns, for example, of corporations caught in an unending and apparently sterile cycle of takeover, merger and break-up. The Merritts of this world are pikers indeed in their demands on the legal system in comparison with the corporate adventurers. Nor is lying a vice unique to prisons. Current reports suggest that Wall Street

and the nation's capital also may have some experience with it.

Above all Judge Posner seems to want to prove Merritt a charlatan—hoodwinking a few credulous judges with ease. The hard evidence is difficult to interpret and even appellate judges, who usually claim to know a lot, are beyond their depth in medical diagnosis. In this case, the brief of the state defendants furnishes all sorts of dubious ammunition in the cause of discrediting Merritt. As Judge Posner's opinion notes, the reports from the University of Illinois Sickle Cell Eye Clinic—one dated January 22, 1986 and the other dated February 18, 1986—give startlingly different impressions of the severity of Merritt's loss of sight. The first letter suggests only moderate damage and the second severe impairment incurable by laser or surgical intervention and uncorrectable by any sort of lenses. It is undisputed, of course, that Merritt had cataracts and suffered from sickle cell S–C disease. Whether his vision is improving, getting worse or merely maintaining itself at some diminished level is certainly not clear; these opinions are becoming a sort of judicial Grand Rounds.[2]

In any event, Merritt, now armed with adequate legal representation, has received a settlement which seems to meet his legitimate problems. The absence of a dramatic victory on the merits here should not deter us from appointing counsel where the facts are complex and the issues elusive, as they were here. As I have suggested before, contingent fees will not likely break down the formidable barriers to entry that surround the prison litigation "market." *Merritt,* 697 F.2d at 768.

POSNER, Circuit Judge, concurring.

Karl Marx said that every great event or personality appears twice in history: first as tragedy and then as farce. This case, a prisoner's civil rights case, illustrates his adage, provided we do not insist on the greatness of the event. When the case was first here, four years ago, the judges on the panel (Judge Cudahy and I, and Senior Judge Swygert) engaged in a serious debate over whether the district judge should have appointed counsel to represent a blind prisoner who claimed that his blindness was due to the prison's deliberate indifference to his medical needs and hence that the prison officials had subjected him to cruel and unusual punishment. See 697 F.2d 761 (7th Cir.1983). I argued that if Merritt really had a meritorious case, it was a money case, and he could have hired a lawyer on a contingent-fee basis (with the added inducement provided by the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988) to handle it; his failure to do so suggested to me that he did not have a meritorious case. See 697 F.2d at 769–71 (separate opinion). The contingent-fee contract is the usual method of financing personal-injury damage suits in this country, and, when a prisoner plaintiff has good prospects for a substantial damage award, is as usable in a prisoner's constitutional-tort case as in any other tort case.

The majority rejected my analysis and ordered that Merritt be given counsel to represent him in a new trial, predicting that "when properly presented the evidence in this case will consist of quite complex and probably contradictory evidence from medical experts, the plaintiff, and the defendants. Testing their opinions and their credibility will require the skills of a trained advocate to aid the factfinder in the job of sifting and weighing the evidence." *Id.* at 765. Judge Cudahy wrote a concurring opinion in reply to my (partial) dissent. He emphasized that "we are dealing here with a blind man." *Id.* at 768. He suggested that "the laws of economics take a different turn when prison walls intervene." *Id.*

From the start there was something fishy about this case. Merritt had stuck his thumb in his eye, and was complaining that the prison had neglected the injury and that as a result he had become blind. Yet the prison—it was uncontested—had

---

2. As an aside, two eye doctors from the Soviet Union recently examined Leonard Peltier, who is an inmate at the Leavenworth penitentiary. They recommended drugs for his vision problems not available in the United States. N.Y. Times, June 25, 1987, at 4, col. 2.

had him examined by an ophthalmologist, another physician, and an optometrist, all within two days of the accident, and later had taken him to the best medical center (that of Indiana University) in Indiana. While Merritt claimed that the doctors there had operated on the wrong eye, he did not name any of the doctors as defendants and it is hard to see how their negligence (if such there was) would translate into a violation of the Eighth Amendment. We have been at pains to stress the difference between negligence, which is not actionable under the Eighth Amendment, and the kind of reckless indifference to medical need that can violate the amendment. See, e.g., *Duckworth v. Franzen*, 780 F.2d 645, 652–53 (7th Cir.1985).

But however this may be, and whatever the merits of Judge Cudahy's speculations about the domain of economics, the only fruit of the majority's decision to order the appointment of counsel for Merritt in the district court has been to establish that Merritt's suit is frivolous. Not only have his vision problems nothing to do with the Eighth Amendment; he may have been faking his blindness. The "settlement" that his appointed counsel (an experienced trial lawyer) negotiated on his behalf and that this court upholds today is a face-saving give-up. There is no award of damages, of other compensation, or of attorney's fees; no injunction; no relief of any sort except that the dismissal is conditioned on the prison's agreeing to pay for an annual eye check-up for Merritt at a designated clinic plus treatment at the state's expense if indicated by the check-up. Since Merritt's eye troubles are caused by sickle cell anemia, and there is no treatment for the underlying condition and little if any for its symptoms, Merritt may never receive any treatment. But if he does, it will be no less than he would be entitled to receive without the stipulation; for a prison is not allowed to neglect a prisoner's serious medical condition of which it knows. (We were told at argument that Merritt's parole is imminent, but it is unclear what effect that will have on the defendants' agreement with him.)

Furthermore, the agreement is not embodied in a consent decree. There is merely a stipulation of dismissal, so that if the defendants violate the agreement Merritt will have no remedy by way of contempt, and probably no remedy at all except to reinstate this worthless suit. See *McCall-Bey v. Franzen*, 777 F.2d 1178, 1183–84 (7th Cir.1985). Merritt told the district judge that he would be happy to settle for an early release from prison ("All I want the state to do is grant me a medical release, and I can take it from there. No damage, they don't have to give me anything"). He didn't get that either. He has gotten nothing out of this suit, except to waste many people's time.

Throughout this litigation Merritt has claimed to have only light perception in his right eye, and not even that in his left. On July 25, 1984, after we had remanded the case, the doctors at the University of Illinois Sickle Cell Eye Clinic in Chicago—the clinic later specified in the settlement agreement—examined Merritt's eyes. When he said he couldn't perceive light with his left eye, the doctors decided to test his statement by shining a bright light in that eye. He winced, and admitted he had light perception in that eye as well as in the right eye. The doctors thought he could see more than light—thought in fact that he should have 20/100 vision in his right eye and 20/50 in his left (he had a cataract in his left eye—otherwise the vision in that eye might have been normal), unless he was "suffering from some disorder posterior to the eye that we are unable to see." A patient with 20/50 and 20/100 vision has keener eyesight than most federal judges.

The doctors sent Merritt to another specialist to find out whether there was indeed some "disorder posterior to the eye" that might account for Merritt's claimed inability to see. This specialist, Dr. Fishman, examined Merritt on August 13, 1984, found no such disorder, and reported:

The patient claims to have lost all vision essentially since 1980.... Of great interest, the patient was able to identify the symbols on the American Optical HRR Plates.... The findings ... would strongly suggest that the patient's vision

potential is considerably better than we are obtaining on standard acuity tests. Although the exact level cannot be quantified with great certainty, the probability exists that vision in the left eye is either within normal limits or is only minimally reduced. Regardless, with his ability to discriminate colors and have [sic] excellent stereo acuity, the patient's vision cannot be hand motion or light perception. The level must be appreciably better.

The clinic next examined Merritt on January 22, 1986, and found no change in his condition. A letter that Merritt sent the district judge, dated October 28, 1985, and a motion that he filed with the court on June 18, 1986, both contain flawless signatures—right on the dotted line; not what you would expect from a blind man.

Merritt does have eye disease, though, and possibly it impairs his vision more than the three reports on which I have drawn, and the signatures, indicate. For on February 18, 1986, the same doctor who had signed the report of the January 22 examination, after stating that Merritt's condition was due to sickle cell anemia, added: "Given the extent of Mr. Merritt's visual loss, we doubt that a referral to a low vision specialist for telescopic or magnified glasses would help." This doctor, however, had not seen the report by Dr. Fishman.

What is not in doubt is that Merritt has greatly exaggerated his loss of vision and that such loss as he does have, the extent of which remains unclear, is due to sickle cell anemia, an incurable condition, rather than to the prison's neglect of (let alone deliberate indifference to) the thumb-in-the-eye incident; and anyway there is no evidence of such neglect. The case is frivolous, because of Merritt's total failure to prove either liability or causation; so he can hardly complain that the settlement provides him with only insignificant relief—annual eye examinations for a condition that is not treatable.

Prisoners, however heinous their crimes, are human beings, and have constitutional rights, which prison officials sometimes violate. But experience has shown that frivolous cases are the norm in prisoner civil rights litigation. Inmates have much time on their hands (especially long termers like Merritt, a first-degree murderer), and bountiful access to law libraries and the federal courts. Last year they brought 20,842 civil rights suits in federal district courts. 1986 Ann.Rep. of Director, Admin.Off. of U.S. Courts 176 (tab. C2). Inmates love turning the tables on the prison's staff by hauling it into court. They like the occasional vacation from prison to testify in court. They enjoy being able to portray themselves as victims rather than predators. They delight in transmuting remorse for their criminal behavior into righteous indignation against their keepers. Their antics are not a free good, however; they waste the time of prison officials, federal judges, and, in this case, appointed counsel, who labored diligently in a barren vineyard. In Merritt's first trial he was represented by two "lay advocates" (jailhouse lawyers) rather than a real lawyer, and managed to conceal the fakery in his claim of blindness, though he still lost the case. When a lawyer was appointed for him, the jig was up and a nominal settlement was the best that Merritt could hope for. He is not well named; the case has not merited two appeals to this court.

We should cast a colder eye on these cases. To speak with some understatement, prison inmates often lie. This is partly because criminals are less scrupulous than law-abiding people (the premise of Fed.R.Evid. 609(a), which allows the use of prior convictions to impeach a witness's credibility), and partly because there are no effective sanctions for prisoners who bring frivolous suits or give untruthful testimony. We should not have been taken in so readily by the affecting tale of a blind prisoner who, by being forced to proceed to trial without a lawyer, was thwarted in his effort to bring to book the callous prison officials whose indifference to his medical needs caused him to go blind. If the tale were true, he could, despite his poverty, have hired a lawyer in the private market. His failure to do so, we now know, is evidence not that prison walls keep out the

laws of economics but that Merritt's affecting tale was a fantasy.

There is a danger, well illustrated by this case, of misusing the power to appoint counsel, by deflecting lawyers from more to less meritorious cases. See *Darden v. Illinois Bell Tel. Co.,* 797 F.2d 497, 504–05 (7th Cir.1986) (concurring opinion). The time that the lawyer appointed for Merritt spent on this case was time that this experienced trial lawyer could have spent on cases with greater promise. The supply of high-quality legal services is not unlimited; some potential plaintiff, somewhere, was denied counsel of his choice so that Merritt could harass the Indiana prison system. We judges should be more sensitive than we sometimes are to the invisible costs of our rulings, by which I mean the costs that the rulings impose on persons who are not parties to the immediate litigation. It is no answer that the average prisoner's rights case is not a "big" case; we must multiply by 20,842 to get the aggregate burden of prisoner civil rights litigation on the federal court system. Mindful that attorneys' time is not a free good that we can shift about as we please without harming other people who need legal services, we should let the market direct the allocation of those services in cases where there is an effective market in them; and does anyone doubt that there is vigorous competition among lawyers to represent on a contingent-fee basis tort plaintiffs with meritorious claims for substantial damages? Above all we should not be blinded by the sentimental appeal of the litigant to the repercussions of our decisions for the unrepresented community at large. Only if we take this lesson to heart will the mistake that this court made in ordering the appointment of counsel for Merritt be redeemed.