Earl **BOTHWELL,** Plaintiff,

v.

**REPUBLIC TOBACCO CO.,
et al., Defendants.**

No. 4:CV94–3093.

United States District Court,
D. Nebraska.

Dec. 15, 1995.

---

**13.** See Part VIII of this Order.

---

## MEMORANDUM AND ORDER

PIESTER, United States Magistrate Judge.

Before me for consideration is a motion (filing 50), submitted by plaintiff's appointed counsel, Paula Metcalf, seeking reconsideration and vacation of my order appointing her to represent plaintiff in this case (filing 49). For the reasons set forth below, I shall grant the motion and vacate my order of appointment.

## BACKGROUND

In March 1994 plaintiff Earl Bothwell, who at the time was incarcerated at the Hastings Correctional Center, submitted to this court a request to proceed in forma pauperis (filing 1), a civil complaint (filing 3), and a motion for appointment of counsel (filing 4). I provisionally granted plaintiff's request to proceed in forma pauperis, pending receipt of trust account statements from his correctional institution. (Filing 2.) I then ordered that plaintiff's complaint be filed. (*Id.*)

In his complaint plaintiff alleged that he "immediately ceased" purchasing and smoking factory-manufactured cigarettes after Congress enacted the Federal Cigarette Labeling and Advertisement Act of 1969 ("FCLAA"), 15 U.S.C. § 1333 *et seq*, which mandated that a warning label be conspicuously placed on packages of such cigarettes. (Filing 3, at 3.) Plaintiff alleged that he thereafter switched to "roll your own" cigarettes, which were not covered by the FCLAA. (*Id.*) Defendants Republic Tobac-

co Company and Brown & Williams Tobacco Corporation produce and distribute the shredded, "loose" tobacco which plaintiff used in making his "roll your own" cigarettes. (*Id.* at 2–3.) Plaintiff alleged that he switched to the defendants' products on the belief that, because the government had not mandated warning labels on loose tobacco and because the defendants had not voluntarily issued such warnings, those products were not harmful or hazardous. (*Id.* at 3–4.) Plaintiff alleged that in 1986 he became aware that he suffered from emphysema, asthma, heart disease, and "bronchial and other respiratory diseases." (*Id.* at 4.) He later learned that the loose tobacco products he had been using "were stronger that [sic] [factory-produced] cigarettes and were twice as harmful and deadly." (*Id.* at 5.)

Upon consideration of the complaint I noted that plaintiff had raised two claims under this court's diversity jurisdiction. (Filing 5.) Specifically, I noted that plaintiff's complaint raised claims under the following theories of Nebraska tort law: (1) failure to warn under a negligence theory; and (2) fraudulent misrepresentation. (*Id.*) I concluded that it did not appear that those claims were preempted by the FCLAA. (*Id.*) However, I further concluded that plaintiff had failed to state a claim upon which relief could be granted. (*Id.*) I deferred ruling on plaintiff's motion for appointment of counsel and granted plaintiff leave to file an amended complaint. (*Id.*)

Subsequently, plaintiff submitted institutional trust account statements (filing 7), paid the $120 filing fee (filing 8), and filed an amended complaint (filing 8). I reviewed the amended complaint and noted that plaintiff had raised the following claims: (1) failure to warn; (2) strict liability; (3) breach of implied warranty of fitness; (4) fraudulent misrepresentation; and (5) FCLAA labeling claim. (Filing 10.) I concluded that plaintiff had failed to state a claim upon which relief could be granted with respect to claims (1), (4), and (5). (*Id.*) I thus recommended dismissal of those claims pursuant to Federal

Rule of Civil Procedure 12(b)(6).[1] (*Id.*) I further concluded that the defendants should respond to plaintiff's strict liability and breach of implied warranty of fitness claims (claims (2) and (3)). (*Id.*) I granted plaintiff's request for appointment of counsel and ordered issuance of summons. (*Id.*)

Following a series of motions to withdraw and appointments of substitute counsel, I appointed Paula Metcalf as plaintiff's counsel. (Filing 24.) Metcalf then filed a "Statement of Appeal" (filing 27) of my appointment order and sought to stay enforcement of that order. (Filing 31.) The Honorable Richard G. Kopf granted the motion for stay and remanded the matter to me for consideration of the issues raised in the Statement of Appeal. (Filing 33.) On remand, I noted that because plaintiff was apparently no longer incarcerated, his eligibility to proceed in forma pauperis was in question. (Filing 35.) I ordered Metcalf to confer with plaintiff regarding his financial status and to submit the pertinent information to the court. (*Id.*) In response to that order, Metcalf submitted a motion to reconsider and vacate (filing 36), a motion to stay (filing 38), and a statement of appeal (filing 39). Judge Kopf granted the motion to stay and the statement of appeal, "thereby relieving [Metcalf] of any obligation to comply" with my order to confer with the plaintiff. (Filing 40.) Judge Kopf also directed plaintiff to provide the court with information regarding his whereabouts and financial status. (Filing 41.)

Thereafter, plaintiff submitted a letter informing the court of his present address, stating that he was unable to afford counsel, and requesting appointment of same. (Filing 43.) I then granted plaintiff twenty days to file a financial affidavit and a statement concerning his efforts to obtain counsel. (Filing 44.) As plaintiff failed to comply with my order in a timely fashion I denied plaintiff's request for appointment of counsel and granted him thirty days to either obtain an attorney or notify the court of his intention to proceed pro se. (Filing 45.) Plaintiff subsequently notified the court that he wished to proceed in forma pauperis, indicating that he was physically unable to work and that he was receiving Supplemental Security Income. (Filing 46.) I granted plaintiff provisional leave to proceed in forma pauperis subject to receipt of further information concerning plaintiff's financial status. (Filing 47.) Plaintiff provided the necessary information (filing 48) and I granted him leave to proceed in forma pauperis. (Filing 49.)

Additionally, I re-appointed Paula Metcalf to represent plaintiff. (Filing 49.) Metcalf then filed a motion requesting that I reconsider and vacate that order. (Filing 50.) Metcalf also filed a "Statement of Appeal" (filing 51) and a motion for a stay of the appointment order (filing 52). Judge Kopf granted the motion for stay and held the appeal in abeyance pending resolution of the motion for reconsideration. (Filing 53.) I then invited several interested parties to submit *amicus curiae* briefs on the questions raised in the motion for reconsideration and deferred my ruling on that motion. (Filing 55.) Metcalf and the *amici* have since submitted briefs.[2]

## DISCUSSION

In her brief in support of her motion to reconsider and vacate, Metcalf contends that my order appointing her as counsel is "contrary to law and clearly erroneous" because "a federal court has no statutory or inherent authority to force an attorney to take an ordinary civil case for no compensation." (Metcalf's Brief, at 8–15.)

### *Statutory Authority*

■ Insofar as concerns statutory authority, Metcalf is correct. Plaintiff in this case is proceeding in forma pauperis pursuant to 28 U.S.C. § 1915(d). In *Mallard v. United*

1. The Honorable Richard G. Kopf subsequently adopted my recommendation and dismissed claims (1), (4), and (5). (Filing 16.)

2. The court expresses its thanks to the following persons and organizations who submitted *amicus* briefs at the Court's request: the Poverty Law Section of the Nebraska State Bar Association; Legal Services of Southeast Nebraska; and Dean Lawrence Raful of the Creighton University School of Law.

*States District Court*, 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989), the United States Supreme Court held, in a 5–4 decision, that section 1915(d)[3] does not authorize a federal court to require an unwilling attorney to represent an indigent litigant in a civil case. *Id.* at 300–08, 109 S.Ct. at 1817–22. In so holding, the Court focused on the language of section 1915(d), which provides that a court may "request" an attorney to accept a court appointment. *Id.* at 300–07, 109 S.Ct. at 1817–21. The Court examined other statutes and reasoned that, when Congress wanted to require compulsory service, it knew how to do so explicitly.[4] The Court concluded that by using the term "request," Congress was demonstrating its desire not to require such service of attorneys who are appointed to represent indigent litigants.[5] *Id.* However, the Court in *Mallard* left open the question of whether federal courts possess the inherent power to require an unwilling attorney to accept an appointment:

> [n]or do we express an opinion on the question whether the federal courts possess inherent authority to require lawyers to serve. Although respondents and their *amici* urge us to affirm the Court of Appeals' judgment on the ground that the federal courts do have such authority, the District Court did not invoke its inherent power in its opinion below, and the Court of Appeals did not offer this ground for denying Mallard's application for a writ of

mandamus. We therefore leave that issue for another day.

*Id.* at 310, 109 S.Ct. at 1823.

### Inherent Authority

█ After conducting an extensive review of authority and commentary addressing this issue, I am convinced that a federal district court does possess the inherent power to compel an unwilling attorney to accept a civil appointment.[6] The origin and scope of that power are discussed below.

█ Since its inception the federal judiciary has maintained that federal courts possess inherent powers which are not derived from statutes or rules. *See United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812) ("our courts no doubt possess powers not immediately derived from statutes"); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734 (1962) (stating that inherent powers are "governed not by rule or statute"). These inherent powers vest in the courts upon their creation. *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227, 5 L.Ed. 242 (1821) ("[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates"); *Link*, 370 U.S. at 630, 82 S.Ct. at 1389 (inherent powers are "necessarily vested in courts to manage their own affairs").

█ While it is clear that federal courts possess inherent powers, the concept "has

---

**3.** Section 1915(d) provides as follows:

> The court may request an attorney to represent any [person claiming in forma pauperis status] unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious.

28 U.S.C. § 1915(d).

**4.** The Court in *Mallard* cited the following "apparently coercive representation statutes": 18 U.S.C. § 3006A (1982 ed. and Supp. V); 18 U.S.C. § 3503(c); 18 U.S.C. § 4109; 25 U.S.C. § 1912(b); 42 U.S.C. § 1971(f); 42 U.S.C. § 2000a–3(a); 42 U.S.C. § 2000e–5(f)(1); and 42 U.S.C. § 3413(1). *Mallard*, 490 U.S. at 306–07, 109 S.Ct. at 1821.

**5.** I note that prior to *Mallard*, the Court of Appeals for the Eighth Circuit had held that section

1915(d) authorized compelled representation of the indigent. *See Peterson v. Nadler*, 452 F.2d 754 (8th Cir.1971); *White v. Walsh*, 649 F.2d 560 (8th Cir.1981).

**6.** While the Court of Appeals for the Eighth Circuit has never officially memorialized its position on the issue, a panel of the Eighth Circuit issued an unpublished opinion declaring that the District Court for the Eastern District of Missouri "acted properly within its inherent powers" in requiring an unwilling attorney to accept a court appointment to represent an indigent civil plaintiff. *In re Hollander*, No. 89–2419, slip op. (8th Cir. September 12, 1989) (opinion attached), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990). Additionally, the Eighth Circuit, in making appointments in civil rights appeals, does so pursuant to its "inherent power." *See* Form order (attached).

been described as nebulous and its bounds as 'shadowy.'" *Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 561 (3rd Cir.1985) (en banc). In *Eash,* the Third Circuit attempted to distill the judicial exercise of inherent powers into three categories. *Id.* at 562–64. The first and narrowest category was termed "irreducible inherent authority." *Id.* at 562. The powers in this category, which are vested in federal courts by Article III of the Constitution, are those "fundamental to the essence of the court as a constitutional tribunal." *Id.* at 562; *see also Young v. U.S. ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 820–21, 107 S.Ct. 2124, 2144–45, 95 L.Ed.2d 740 (1987) (Scalia, J., concurring) (stating that the "Judicial Branch[ ] must ... possess those powers necessary to protect the functioning of its own processes"); *Sibaja v. Dow Chem. Co.,* 757 F.2d 1215, 1218 (11th Cir.) (discussing inherent power of a court to protect the integrity of its process), *cert. denied,* 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985); *Hastings v. Judicial Conference of the United States,* 593 F.Supp. 1371, 1380 (D.D.C.1984) (noting that the judiciary has the inherent power to govern itself in a way that assures the integrity and independence of the judicial branch), *aff'd in part, vacated in part,* 770 F.2d 1093 (D.C.Cir.1985), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). The inherent authority in this category is grounded in the separation of powers doctrine and thus may be exercised even in the face of contrary legislation. *Eash,* 757 F.2d at 562.

The second category identified by the court in *Eash* includes those powers which are "necessary to the exercise of all others." *Id.; Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (quoting *Hudson,* 11 U.S. (7 Cranch) at 34.). A court's power to sanction for contempt falls within this category because that power is deemed "absolutely essential" to the functioning of the judiciary. *Eash,* 757 F.2d at 562–63 (quoting *Levine v.*

United States, 362 U.S. 610, 616, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960)); *see also Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873) (noting that "power to punish for contempts is inherent in all courts"); *Michaelson v. U.S. ex rel. Chicago, St. P., M. & O. Ry. Co.,* 266 U.S. 42, 65, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924) (same); *cf. Ex Parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824) (discussing inherent power to control admission to the bar and to discipline attorneys); *Theard v. United States,* 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957) (discussing inherent power to admit, suspend, or disbar attorneys in federal courts).

The third category contains those powers which arise from notions of equity and which are necessary "in the pursuit of a just result." [7] *Eash,* 757 F.2d at 563; *see ITT Community Dev. Corp. v. Barton,* 569 F.2d 1351, 1359 (5th Cir.1978) (federal courts possess inherent powers to "process litigation to a just and equitable conclusion"). As an example of an exercise of the authority in this category, the court in *Eash* cited *Ex parte Peterson,* 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920). In *Peterson,* the Supreme Court held that it was appropriate to appoint an auditor to aid the court in its decisionmaking. *Id.* at 312, 40 S.Ct. at 547. The Court in *Peterson* recognized that "[c]ourts have ... inherent power to provide themselves with appropriate instruments required for the performance of their duties" and to appoint "persons unconnected with the court to aid judges in the performance of specific judicial duties." *Id.* Thus, *Peterson* demonstrates that, in seeking to administer justice and bring about a fair and just result, a court must sometimes exercise its inherent power to appoint individuals to act as "instruments" of the court. *See Barton,* 569 F.2d at 1359 (citing *Peterson* for proposition that courts possess inherent powers to ensure fairness and justice); *see also United States v. Bertoli,* 994 F.2d 1002, 1016–17 (3rd Cir.1993)

---

7. I do not read the term "result" as referring solely to the ultimate outcome of an individual case. Rather, that term encompasses the adjudicative process itself so that a court possesses the inherent power to do those things necessary to ensure a fair and just process, as well as a fair

and just final outcome. *Cf. Schwimmer v. United States,* 232 F.2d 855, 865 (8th Cir.) (court's power to appoint individuals to assist applies in "any of the incidents of a proceeding before it"), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956).

(court in criminal action has inherent power to "require standby counsel for the purpose of advancing its own interest in the fair, speedy and efficient disposition of cases on its criminal docket"); *Reilly v. United States,* 863 F.2d 149, 154 (1st Cir.1988) (court possesses inherent power to appoint technical advisers); *Reed v. Cleveland Bd. of Educ.,* 607 F.2d 737, 746 (6th Cir.1979) (court has inherent authority to appoint "expert advisors or consultants").[8]

Some commentators have asserted that a court's inherent power to compel an attorney to represent an indigent litigant most readily falls into the third *Eash* category containing those equitable powers necessary to bring about a fair and just result. Note, *Invoking the Inherent Powers Doctrine to Compel Representation of Indigent Civil Litigants in Federal Court,* 10 Rev.Litig. 769, 782 (1991); Note, *Mallard v. United States District Court: Attorney May Refuse Federal Judge's Request to Represent Civil Plaintiff Proceeding In Forma Pauperis,* 35 Vill. L.Rev. 1175, 1233 (1990). However, as further discussed below, the power to conscript lawyers to represent the indigent is necessary not only to achieve fairness and justice in individual cases, but also to protect the integrity and proper functioning of the judicial branch. *See* Tigran W. Eldred & Thomas Schoenherr, *The Lawyer's Duty of Public Service: More than Charity?,* 96 W.Va. L.Rev. 367 (1993); David Luban, *Lawyering and Justice: An Ethical Study* (1988). As such, that power can also be said to fall within the first two *Eash* categories. *Eash,* 757 F.2d at 562–63. Specifically, then, this court's inherent power to compel representation of the indigent exists for two primary purposes: (1) to ensure a "fair and just" adjudicative process in individual cases; and (2) to maintain the integrity and viability of the judiciary and of the entire civil justice system. These two purposes mirror the dual functions that lawyers serve in the civil justice system. First, they act as advocates in individual cases working to peacefully resolve civil disputes between citizens. Second, by their ready availability to act in that capacity, they preserve the credibility of the courts as a legitimate arm of the civil justice system. The following discussion explores the court's inherent authority to conscript unwilling counsel to achieve each of the foregoing purposes.

### (1) "Fair and Just" Process in Individual Cases

 As noted above, in seeking to bring about the fair and just resolution of a case, a court may exercise its inherent power to appoint individuals to act as "instruments" of the court. While it is established that a plaintiff has no constitutional right to counsel in a civil case, *Wiggins v. Sargent,* 753 F.2d 663, 668 (8th Cir.1985); *Caruth v. Pinkney,* 683 F.2d 1044, 1048 (7th Cir.1982) (en banc), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983); *Aldabe v. Aldabe,* 616 F.2d 1089, 1093 (9th Cir.1980); *Cook v. Bounds,* 518 F.2d 779, 780 (4th Cir.1975), counsel nevertheless may be necessary in a particular civil proceeding to ensure fairness and justice in the proceeding and to bring about a fair and just outcome. *Merritt v. Faulkner,* 697 F.2d 761, 764 (7th Cir.) ("*Merritt I* ") (holding that particular circumstances in a civil case "may make the presence of counsel necessary"), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983).

The American legal system is adversarial in nature. *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799

---

**8.** Other examples of inherent powers which could be said to fall within the third category are found in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (recognizing "historic power of equity to set aside fraudulently begotten judgments"); *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (finding power to bar a disruptive criminal defendant from the courtroom); *Link v. Wabash R.R. Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (recognizing power to dismiss a suit *sua sponte* for failure to prosecute); *Kleiner v. First Nat'l Bank,* 751 F.2d 1193 (11th Cir.1985) (discussing power to disqualify counsel from a case); *Estep v. United States,* 251 F.2d 579 (5th Cir.1958) (recognizing power to subpoena witnesses for indigent civil litigants); *United States v. Adamita,* 701 F.Supp. 85 (S.D.N.Y.1988) (relying on power to order an employer to continue paying an employee her full salary during a lengthy trial); and *In re Novak,* 932 F.2d 1397 (11th Cir.1991) (recognizing power to require the attendance of a party).

(1963); Note, *The Right to Counsel in Civil Litigation,* 66 Colum.L.Rev. 1322, 1331 (1966) (noting that the "American legal system is built upon .the adversarial model"). The adversarial system has been embraced because it is believed that truth is best divined in the crucible of cross examination and adversarial argument. *Lockhart v. Fretwell,* 506 U.S. 364, 377, 113 S.Ct. 838, 847, 122 L.Ed.2d 180 (1993) (Stevens, J., dissenting) (noting that without the " 'crucible of meaningful adversarial testing,' there can be no guarantee that the adversarial system will function properly to produce just and reliable results"), quoting *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984). Attorneys, because they are trained in the advocacy skills of cross examination and argument, are a necessary component in a properly functioning adversarial system. *See Johnson v. Williams,* 788 F.2d 1319, 1323 (8th Cir.1986) (because lawyers are trained in the presentation of evidence and cross-examination they are best able to present and argue the issues so that the truth will be exposed and justice administered), citing *Maclin v. Freake,* 650 F.2d 885, 888 (7th Cir.1981). Thus, the notion that the adversarial system is an effective method for ferreting out the truth presumes that both sides have relatively equal access to adequate legal assistance from those trained in the art of advocacy. *Merritt I,* 697 F.2d at 764 n. 3; *Former Emp. of Rocky Mt. Off. of Terra Res. v. United States,* 13 CIT 427, 713 F.Supp. 1433, 1435 (1989).

Where one side is without adequate legal representation, the adversarial system may not be effective. *Merritt I,* 697 F.2d at 764 n. 3; *see Bounds v. Smith,* 430 U.S. 817, 826, 97 S.Ct. 1491, 1497, 52 L.Ed.2d 72 (1977) ("even the most dedicated trial judges are bound to overlook meritorious cases without the benefit of an adversary presentation"); *McKeever v. Israel,* 689 F.2d 1315, 1323 (1982) ("[w]e firmly believe that our adversary system of justice works best when both sides are zealously and competently represented"); *see also* Marrero, *Committee to*

*Improve the Availability of Legal Services—Final Report to the Chief Judge of the State of New York,* 19 Hofstra L.Rev. 755, 782 (1991). As the Court of Appeals for the Seventh Circuit explained:

> In some civil cases meaningful access [to the courts] requires representation by a lawyer. In *Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 63–64, 77 L.Ed. 158 (1932), Justice Sutherland observed that:
>
> > The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law.

*Id.* at 763 (quoting *Powell v. Alabama, supra* ).

If the lack of legal representation is the free choice of the unrepresented party or if it results from factors unrelated to the indigency of the plaintiff, our system is not offended. Where, however, one party is unable to obtain legal representation because of indigency, the resulting disparity of advocacy skills clearly offends the principle of "equality before the law" underlying our system. Luban, *supra,* at 251–54; *see also Griffin v. Illinois,* 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956) ("[t]here can be no equal justice where the kind of a trial a man gets depends on the amount of money he has"). Further, a substantial disparity in access to legal representation caused by the indigency of one of the parties threatens the adversarial system's ability to produce a just and fair result.[9] *See Merritt I,* 697 F.2d at 764 n. 3.

Access to legal representation in this country is gained primarily through the private market. For the most part, the market is an effective mechanism for providing legal services to those who need them. However, the market sometimes fails to provide counsel regardless of the merits of the claims at issue. Where the person whose claims have been rejected by the private market is indigent, he or she may seek representation

---

**9.** Some might argue that this same reasoning applies in all cases where there is a disparity in the financial status of the parties because the party with greater wealth can hire a more quali-

fied advocate. However, I do not subscribe to the view that a more expensive attorney is necessarily a better advocate.

through a legal aid organization. However, the ability of such organizations to meet the needs of the indigent has taken a serious hit over the past fifteen years in the form of reduced funding to the Legal Services Corporation ("LSC"), the federal entity responsible for funding state and local legal aid offices. In 1981 the LSC had almost reached its stated goal of providing two legal services lawyers for every 10,000 poor persons. Richard L. Abel, *Law Without Politics: Legal Aid Under Advanced Capitalism*, 32 U.C.L.A.L.Rev. 474, 547 (1985). In 1982, the LSC budget was slashed from $321 million to $241 million. Eldred & Schoenherr, *supra.* Those funding cuts resulted in a drastic reduction in the number of legal services attorneys, as well as the closing of many legal aid offices nationwide. *Id.* The effect of those cuts is still felt today; to attain the 1981 ratio of lawyers to poor people, it is estimated that the current Legal Services Corporation budget would have to be nearly doubled. Matthew Diller, *Poverty Law in the Golden Age*, 93 Mich.L.Rev. 1401, 1432 n. 80 (1995). *Id.* Rather than increasing that budget, however, the current Congress is considering further cuts in legal services funding.[10] Jon Newberry, *Temporary Reprieve for the LSC*, ABA Journal, at 18–19 (December 1995). Also being considered are greater restrictions on the types of practice which legal aid organizations can provide to the indigent. *Id.* Compounding the problem of legal access for the poor is the growing apathy of the private bar to the plight of many indigent litigants. *See* Eldred & Schoenherr, *supra.* The inevitable net result of these factors is that the poor, indeed most of the so-called "middle class," have less realistic access to advocacy services from lawyers.

The foregoing discussion establishes that: 1) courts possess the inherent power to bring to their assistance those "instruments" necessary to ensure a "fair and just" adjudicative process in individual cases; 2) in many, if not most, cases, due to the adversarial nature of our system, lawyers are a neces-sary component in ensuring such a "fair and just" process; 3) to a significant degree, neither the private marketplace nor public or charitable efforts provide indigent litigants with adequate access to legal assistance; and 4) to that extent, such failure threatens the reliability of the results of the adversarial process. On these bases, I conclude that, when indigency is the principal reason for disparate access to the civil justice system in an individual case, a federal court does possess the inherent authority to bring about a fair and just adjudicative process by conscripting an unwilling lawyer to represent the indigent party. A further basis for the existence of such authority is set forth below.

### (2) Preserving the Integrity of the Civil Justice System.

The very purposes for the establishment of the judicial branch of government included the peaceful resolution of private disputes between citizens and the protection of the minority from loss of their rights to the majority, either at the ballot box or through force. *See Talamini v. Allstate Insurance Company*, 470 U.S. 1067, 1070–71, 105 S.Ct. 1824, 1826, 85 L.Ed.2d 125 (1985) (Stevens, J., concurring) ("courts provide the mechanism for peaceful resolution of disputes that might otherwise give rise to attempts at self-help"); The Federalist No. 10, at 104 (J. Madison) (Hamilton ed. 1868) (warning against a society in which "measures are too often decided, not according to the rules of justice and the rights of the minor party, but by the superior force of an interested and overbearing majority").

In order to be viable in delivering on these goals, a justice system must be both trustworthy and trusted. The judicial branch of our government was created powerless to enforce its own decisions; it relies on the respect of litigants for adherence to the law it declares, or, if necessary, actions of the executive branch. *See* The Federalist No. 78, at 393–94 (G. Willis ed. 1982) ("[t]he judiciary ... may truly be said to have nei-

---

**10.** An interesting question not before the court is whether the judicial branch has the power to require the legislative branch to appropriate funds to the Legal Services Corporation in the interest of preserving the integrity of the civil justice system. *Cf. Missouri v. Jenkins,* 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990) (a court can direct a local government to fund desegregation of public schools).

ther FORCE nor WILL but merely judgment"). It is, to be sure, a living example of "the consent of the governed." *See* The Declaration of Independence. To be accorded respect among the people it serves, it must be perceived as fair. If it is not trusted, it will not be seen as a legitimate means to serve its purposes of peacefully resolving disputes and protecting minority rights.

So careful is our court system in safeguarding its trustworthiness, that it has protected not only against improper practices, but also against those practices which might create an "appearance of impropriety;" that is, those which cast doubt on the fairness of its decisions by appearing to allow improper motivations or influences to enter the decision-making process. *See* Code of Judicial Conduct, Canon 2 (1993); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 865, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988) (holding that judicial disqualification statute, 28 U.S.C. § 455(a), requires members of the judiciary to avoid even the "appearance of impropriety"). It thus seeks to protect itself from actions which might cast doubt on the public's perception of its fairness—the very foundation of its legitimacy. All of these actions reinforce the perception of fairness and justice, without which the judicial branch simply could not carry out its civil functions.

While the purposes of peacefully resolving disputes and protection of the minority from the overbearing will of the majority remain as essential today as they were at our country's founding, the ability of the courts to fulfill them is currently being eroded by a number of forces. First, the use of violence as a means to settle differences is increasing at an alarming rate; it has become an effective alternative to the civil justice system. *See generally* Jeffrey A. Roth, U.S. Dept. of Justice, *Understanding and Preventing Violence* 2 (1994); *see also* Charles E. Rice & John P. Tuskey, *The Legality and Morality of Using Deadly Force to Protect Unborn Children From Abortionists*, 5 Regent U.L.Rev. 83 (1995). Second, the reduction of governmental resources to provide legal services to the poor is, for them, a removal of the civil justice system's accessibility (and thus, its legitimacy). *See generally* Louise

G. Trubek, *The Worst of Times . . . The Best of Times: Lawyering for Poor Clients Today*, 22 Fordham Urb.L.J. 1123 (1995). Third, the other two forces are accommodated by the failure of attorneys to recognize that the legitimacy of the system in which they operate depends upon its equal accessibility to all population groups and by the concomitant attitude that the license to practice law is an entitlement to practice law SOLELY for private gain. *See* Eldred & Schoenherr, *supra*. These trends require examination at greater length in other fora, but they also call upon us in the justice system to look again at the roles lawyers have played and do play in our court system as related to the viability of that system itself.

Lawyers as Officers of the Court

■ The extent to which attorneys are linked to the judiciary, as "officers of the court" or otherwise, has been the topic of much commentary over the past fifteen years. *See e.g.* Martineau, *The Attorney as an Officer of the Court: Time to Take the Gown Off the Bar*, 35 S.C.L.Rev. 541, 560 (1984); Shapiro, *The Enigma of a Lawyer's Duty to Serve*, 55 N.Y.U.L.Rev. 735 (1980); Matalon, *The Civil Indigent's Last Chance for Meaningful Access to the Federal Courts: The Inherent Power to Mandate Pro Bono Publico*, 71 B.U.L.Rev. 545 (1991); Fisch, *Coercive Appointments of Counsel in Civil Cases in Forma Pauperis: An Easy Case Makes Hard Law*, 50 Mo.L.Rev. 527 (1985); Note *Court–Appointed Counsel: The Constitutionality of Uncompensated Conscription*, 3 Georgetown J.Leg.Ethics 503, 512 (1990); Note, *The Constitutionality of Compulsory Attorney Service: The Void Left by Mallard*, 68 North Carolina L.Rev. 575 (1990); Note, *Court Appointment of Attorneys in Civil Cases: The Constitutionality of Uncompensated Legal Assistance*, 81 Colum.L.Rev. 366 (1981); Note, *Mallard v. United States District Court, Relying on a Definition but Failing to Define the Rights of Court Appointed Attorneys*, 69 Neb.L.Rev. 925 (1990).

One of the most oft-cited federal cases for the proposition that attorneys are "officers of the court" is *United States v. Dillon*, 346 F.2d 633, 636–37 (9th Cir.1965), *cert. denied,*

382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966). In an appendix to its opinion in *Dillon*, the Court of Appeals for the Ninth Circuit traced the history of the officer-of-the-court doctrine to English common law. The court noted that English "serjeants-at-law" were required " 'from a very early period . . . to plead for a poor man.' " *Id.* at 636 (quoting Holdsworth's History of English Law, vol. 2, p. 491 (3d ed., 1923)). The court further noted that, "in colonial America, there was, in addition to the common law, a more extensive statutory recognition of the obligation to represent indigents upon court order." *Id.* at 637. The court in *Dillon* concluded that "the obligation of the legal profession to serve indigents on court order is an ancient and established tradition, and that appointed counsel have generally been compensated, if at all, only by statutory fees . . . usually payable only in limited types of cases." *Id.* at 635.[11]

The accuracy of the historical justifications for the officer-of-the-court doctrine extolled by the Ninth Circuit in *Dillon* has been questioned recently by courts and commentators. *See e.g. Colbert, supra; State ex rel. Scott v. Roper,* 688 S.W.2d 757 (Mo.1985) (en banc); Shapiro, *supra;* Matalon, *supra.* These critics of the *Dillon* analysis contest the use of English tradition to support the doctrine. Under the ancient English legal system there were two classes of lawyers: attorneys or serjeants-at-law and barristers. Note, *supra,* 81 Colum.L.Rev. at 374; Matalon, *supra,* at 567. Serjeants-at-law were considered an elite class of lawyers who enjoyed the privileges of the judiciary, including various immunities. Martineau, *supra,* at 546–48. Judicial appointments were made exclusively from their ranks. Note, *supra,* 69 Neb.L.Rev. at 937. Serjeants-at-law took an oath to serve the King's people and uphold justice and were required to accept court appointments to represent the poor. *Id.* Critics of *Dillon* concede that a serjeant-at-law truly was an officer of the court; they contend, however, that "[h]e has no counterpart in American practice." *Id.* (quoting Shapiro, *supra,* at 746). Critics claim that modern American lawyers more closely re-

semble English barristers, who were not considered officers of the court. Martineau, *supra,* at 543–44; Note, *Pro Bono Publico: Issues and Implications,* 26 Loy.U.Chi.L.J. 61 (1994).

The critics also challenge the *Dillon* court's reliance on colonial tradition, contending that there is no clear history in the American colonies of compelled representation in the civil context. *E.g.* Shapiro, *supra,* at 744 (stating there was "considerable variation" among colonies about whether to compel uncompensated representation). These critics conclude that the officer-of-the-court doctrine may not properly be asserted as a justification for compelled representation of indigents.

The critics' challenges to the validity of the officer-of-the-court doctrine, while forceful, are flawed in several respects. First, the claim that there is no direct counterpart to the serjeants-at-law in the American legal system actually serves to underscore the void in needed representation of indigent litigants. Because there is no special class of attorneys in the American system whose primary task is to provide such representation in civil cases, and, as discussed above, the realistic opportunities available to the poor to participate in the civil justice system are, at best, extremely limited, there simply is, at present, no other source than the private bar capable of providing representation to indigents.

Second, even assuming that the historical foundation for the officer-of-the-court doctrine is not as solid as once thought, the fact remains that court-compelled appointments for indigents have been made for centuries. *See Dillon,* 346 F.2d at 636–37. In fact, one legal historian has traced the requirement of indigent representation back to the ecclesiastical courts of the thirteenth century. *See* Macaluso, *That's O.K., This One's On Me: A Discussion of the Responsibilities and Duties Owed By the Profession to Do Pro Bono Publico Work,* 26 B.C.L.Rev. 65, 66 (1992).

Third, quite apart from any role the officer-of-the-court doctrine may have played in

---

**11.** The Eighth Circuit adopted the reasoning of the *Dillon* opinion in *Tyler v. Lark,* 472 F.2d 1077, 1079 (8th Cir.1973) (Van Pelt, J., sitting by designation).

England or the colonies, that doctrine has become and is part of the fabric of American jurisprudence. *See e.g. In re Leigh,* 15 Va. (1 Munf.) 468 (1810) (describing attorney's "office" as "the duties owed by the person to the court arising out of the person's relationship to it"); *Ex parte Secombe,* 60 U.S. (19 How) 9, 13, 15 L.Ed. 565 (1856) (asserting that "it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor"); *People ex rel. Karlin v. Culkin,* 248 N.Y. 465, 162 N.E. 487 (1928) (Cardozo, J.) ("[t]he appellant was received into that ancient fellowship for something more than private gain ... [h]e became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice"); *Starkweather v. Greenholtz,* 173 F.Supp. 671, 674 (D.Neb. 1959) (Van Pelt, J.) (referring to attorney as "officer of the court"); *Powell,* 287 U.S. at 73, 53 S.Ct. at 65 (opining that "[a]ttorneys are officers of the court, and are bound to render service when required by such an appointment"); *Williamson v. Vardeman,* 674 F.2d 1211, 1215 (8th Cir.1982) (referring to "a lawyer's status as an officer of the court").

Finally, critics of the officer-of-the-court doctrine have failed to recognize the role that the availability of lawyers has played and continues to play in maintaining the integrity of the civil justice system. Because the ready availability of lawyers is necessary to ensuring the perception, and indeed the reality, of fairness, their accessibility as officers of the court is necessary not only to the preservation of the justice system itself but to the ordered liberty of our society. *See* Luban, *supra,* at 251 ("if the have-nots are excluded from access to the legal system, 'the end whereof to protect and redress the innocent' ..., their alternative is the law of the streets, of resistance that is entirely rightful"), quoting John Locke, *Second Treatise of Government, In Two Treatises of Government* § 20 at 322 (Cambridge University Press (1960). For all of the foregoing reasons, I conclude that it is inappropriate to discard the officer-of-the-court doctrine as a justification for compelled representation of the indigent.

### Monopoly of Lawyers

■ A further justification which has been advanced for the view that attorneys are obligated to comply with court-ordered appointments is the monopoly theory. Under that theory, attorneys must provide legal services to indigents without compensation by virtue of the exclusive privilege they have been granted to practice law. *See United States v. Accetturo,* 842 F.2d 1408, 1413 (3d Cir.1988) ("[a]ttorneys who have the privilege of practicing before the court have a correlative obligation to be available to serve the court"); *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 453, 110 S.Ct. 768, 791, 107 L.Ed.2d 851 (1990) (Blackmun, J., concurring in part, dissenting in part) (courts have inherent authority to compel attorneys to represent indigent litigants "as a condition of practicing law in the District or on pain of contempt"). Regulation of attorney licensing limits the number of individuals who may practice law. As a result, those relatively few individuals who are licensed benefit financially, thereby compensating them for any financial losses incurred by representing indigents. Note, *supra,* 81 Colum.L.Rev. at 388. Also, because meaningful access to the courts can be had only through these licensed attorneys, they are required to represent those who are unable to afford representation. *Accetturo,* 842 F.2d at 1413 ("[t]he court's responsibility for the administration of justice would be frustrated were it unable to enlist or require the services of those who have, by virtue of their license, a monopoly on the provision of such services").

The monopoly theory has not escaped criticism. *See Roper,* 688 S.W.2d at 765 (asserting that the monopoly theory contains many conceptual difficulties). It has been challenged as an inaccurate portrayal of the American legal system. *See id.;* Matalon, *supra,* at 558–560. Specifically, critics have argued that no monopoly actually exists because every individual is free to represent themselves in court or, alternatively, to pursue a legal career. Hazard, *Proceedings of the Second National Conference on Legal Services and the Public* 101 (1979) (contending that monopoly theory should be rejected since people have freedom to pursue a legal

career or obtain the necessary legal knowledge). However, even if theoretically each potential litigant in the population at large had the intellectual capacity to become a lawyer, it is quite improbable that either their opponents or the courts in which they are embattled would stay the pursuit of claims while they did so. As discussed *supra*, meaningful access to the courts often requires representation by someone previously trained, if not experienced, in the practice of law. Thus, while the monopoly may not prevent a party from gaining access to the courts, it very well may prevent the administration of equal justice. Additionally, as one commentator has noted, "a litigant's freedom to pursue a legal career is 'sheer illusion' " due to the rigid training program and the prohibitive costs involved in obtaining a legal education. Matalon, *supra*, at 558 (citing Fisch, *supra* ); *see also* Christensen, *The Lawyer's Pro Bono Publico Responsibility*, 1981 Am.B.Found.Res.J. 1, 15 (stating that "those who surmount the economic and academic barriers ... constitute a genuine elite").

It has been further argued by critics of the monopoly theory that, given the large number of attorneys in practice and competitive nature of the legal profession, no true monopoly exists. *E.g.* Hazard, *supra*, at 101. However, it is undeniable that licensed attorneys do benefit financially from the prohibition against the unauthorized practice of law.[12] Note, *supra*, 81 Colum.L.Rev. at 388; *see also* Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions*, 34 Stan.L.Rev. 1 (1981).

Finally, critics claim that other groups enjoying monopolies as a result of state licensing, such as doctors, nurses, teachers, insurance agents, brokers, and pharmacists, do not bear an obligation to provide free services to the poor. *Id.* at 388. While that is true, it misses the point. The practice of law—that is, the representation of others before the civil courts—is not simply a private enterprise. It is, in addition, a contribution to society's ability to manage its domestic affairs, a necessary condition of any civilized culture. Attorneys have a unique relationship to government not shared by other licensed groups. Fisch, *supra*, at 539 ("[n]o other profession has a similarly indispensable relationship to a major branch of government responsible for the formulation and implementation of public policy, and in none other is public service so much a part of the licensed activity"). This relationship, which has been described as "symbiotic," *Accetturo*, 842 F.2d at 1413, places attorneys in "an intermediary position between the court and the public" where they are "inextricably linked to the public sector despite [their] dual position as a private businessperson." Matalon, *supra*, at 573. "The practice of law in the broad sense, both in and out of the courts, is ... a necessary part of and is ... inexorably connected with the exercise of the judicial power." *Id.* at 569–70 (quoting *In re Integration of the Bar*, 5 Wis.2d 618, 93 N.W.2d 601, 603 (1958)).

By virtue of this special relationship between the bench and the bar, courts are dependent upon attorneys to aid in carrying out the administration of justice. While other professions also contribute to private gain and to the betterment of society's standards of living, no other group holds the exclusive key to meaningful participation in a branch of government and the protection of rights. This monumental difference between attorneys and other licensed groups justifies imposition of different conditions on the practice of the profession.

### Ethical Obligation of Lawyers

■ An additional justification for the court's exercise of inherent power to compel representation is the ethical obligation of attorneys to provide representation to indigent litigants. This obligation arises from the

---

**12.** The folly of arguing that lawyers do not enjoy a monopoly, or that such monopoly does not benefit the justice system, is seen by speculating about the course of trials, the development of the law, and the stability of "domestic tranquility" if licensure were not required in order to represent another in a court or other forum. I seriously doubt that those who disclaim monopoly power would welcome the practice of law by laymen—even skilled ones who had attained proficiency adequate to protect these interests.

law's ideals of professionalism and commitment to public service. Christensen, *supra*, at 7. In addition, the local rules of this court require availability for such service. NELR 83.4(f) provides:

> All members of the bar of this court are subject to be appointed to represent indigent litigants. This is an ethical obligation of attorneys in fulfillment of the underlying precepts of Canon 2 of the Code of Professional Responsibility.

NELR 83.4(f).

The "underlying precepts of Canon 2" require, *inter alia*, that a lawyer appointed to represent an indigent litigant "not seek to be excused" from that obligation "except for compelling reasons." Code of Professional Responsibility, EC 2–29.[13] Rather, the attorney is to "find time to participate in serving the disadvantaged" and render "free legal services to those unable to pay reasonable fees." *Id.* at EC 2–25; *see also* Model Rule of Professional Conduct 6.1 ("a lawyer should aspire to render ... legal services without fee or expectation of fee to[ ] persons of limited means"). While these obligations are not expressed in mandatory terms, they clearly indicate that service to the indigent is an essential characteristic of any ethical attorney. Two aspects deserve further attention.

First, these moral and ethical obligations to provide legal services to the poor do not exist merely to prompt the practicing lawyer to be a "good" person, respected in the profession. Rather, they are a recognition of the critical role of the lawyer in ensuring the fair and just adjudication of disputes, and the need for such advocacy in ensuring the existence of the system. *See* Russel G. Pearce, *Rediscovering the Republican Origins of the Legal Ethics Codes*, 6 Geo.J.Legal Ethics 241 (1992).

Second, these obligations are not self-executing. Platitudes are nice, of course, but if these aspirational "goals" are to be achieved and to have any meaning in fact, there must be some mechanism for gaining compliance. It makes little sense to give only lip service to these ideals while the legitimacy of the court system is being challenged by other means of resolving private disputes. If our society is to have a legitimate civil justice system, the courts must be empowered to take necessary measures to create and maintain it. In a more genteel and public-spirited time, the mere suggestion by a court that a private attorney should provide free representation might be met with acceptance of the duty as a necessary means to ensure fairness and the justice system itself; perhaps that history contributes to the lack of mandatory requirements today. In any event, I view the attorney's ethical obligation to render services to the poor as the "flip side" of the court's inherent authority to provide "instruments" to ensure fairness and justice, and to maintain the relevance of the court system in resolving civil disputes. Both serve the same end: the preservation of a civil means to resolve private disputes.

### A "New" Model?

As one commentator has recognized, the foregoing justifications can be combined into a cogent model justifying the exercise of inherent power to compel representation of the indigent. This "new model," as the commentator dubbed it, is summarized as follows:

> [C]ourts, through their rigid licensing practices, have created a vacuum of representation which jeopardizes equal justice. Licensing practices permit courts to make full use of their control over the bar, and consequently, over the attorneys who compose the bar. Attorneys are therefore transformed into extensions of justice, or rather arms of the court. The court's function is to extend these arms to fill the vacuum. The attorney must obey the court appointment as a result of both the court's power over the bar and her professional responsibilities to society in general.

Matalon, *supra*, at 573 (footnote omitted).

In my view this "new" model is not new at all; it is, rather a recognition of the roles that were historically conceived and established for the participants in our civil justice system. Our governmental system is built

---

**13.** The Code of Professional Responsibility adopted by the Supreme Court of Nebraska governs the standard of conduct of the members of the bar of this court. NELR 83.4(b).

partially upon the concept of citizens being able to redress their grievances and resolve their civil disputes in courts. A judiciary committed to observing notions of fairness, justice, and equality before the law is of paramount importance in maintaining public confidence in that system. Lawyers are essential in maintaining the system because the only realistic way the populace at large can obtain "equal justice" is through the advocacy of those trained in the law. If public confidence in the system wanes, in time, people will find, and indeed already have found, other, less civil, methods of resolving their differences. *See* Luban, *supra,* at 251. Thus, attorneys occupy a unique role in preserving the ordered liberty included in the concept of "domestic tranquility." They are therefore vital to preserving the viability of the third branch of government. *See* David Luban, *Lawyers and Justice: An Ethical Study* (1988).

In accordance with the foregoing discussion, I conclude that, despite authority suggesting otherwise, *see Colbert v. Rickmon,* 747 F.Supp. 518 (W.D.Ark.1990); *cf. Tabron v. Grace,* 6 F.3d 147 (3rd Cir.1993) (stating that courts have "no authority" to compel representation but failing to discuss inherent authority concept); *Hughes v. Joliet Correctional Center,* 931 F.2d 425, 429 (7th Cir. 1991) (stating that "court's power is limited to requesting a lawyer" to serve as counsel for an indigent, but neglecting to directly address inherent authority issue), this court possesses the inherent power to compel representation of an indigent litigant. I further conclude that there are ample historical and theoretical justifications for the existence of that power.

However, the inquiry does not end there. A question remains as to whether that power should be exercised in this particular case.

*Necessity of Exercising Authority*

 In deciding whether to exercise the authority to compel representation I first note that a court must exercise its inherent powers "with restraint and discretion." *Chambers v. NASCO, Inc,* 501 U.S. 32, 44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1990) (citing *Roadway Express, supra,* at 764, 100 S.Ct. at 2463). The common thread running through inherent powers jurisprudence is the concept of necessity. *See e.g. NASCO v. Calcasieu Television,* 894 F.2d 696, 702 (5th Cir.1990) (describing inherent powers as "a product of necessity"), *aff'd sub nom. Chambers v. NASCO, Inc.,* 498 U.S. 807, 111 S.Ct. 38, 112 L.Ed.2d 15 (1991); *Laughlin v. Clephane,* 77 F.Supp. 103, 105 (D.D.C.1947) (courts have "inherent power to provide [itself with] the necessary assistance as a means of conducting its business with reasonable dispatch"). In *United States v. Bowe,* 698 F.2d 560 (2nd Cir.1983), the Court of Appeals for the Second Circuit held that federal district courts may exercise "inherent authority to do those things reasonably necessary for the administration of justice." *Id.* at 566. Thus, while this court possesses the inherent power to compel representation of an indigent plaintiff, the power should be exercised only where reasonably necessary for the administration of justice. In other words, the appointment of counsel must be necessary to bring about a fair and just adjudicative process.

 In filings 5 and 10 I noted that when determining whether counsel should be appointed for an indigent plaintiff, the court should consider such factors as (1) the factual complexity of the case, (2) the ability of the plaintiff to investigate the facts, (3) the existence of conflicting testimony, (4) the plaintiff's ability to present his claims and (5) the complexity of the legal issues. *In re Lane,* 801 F.2d 1040, 1043–44 (8th Cir.1986). An additional factor, not mentioned in the previous filings, is the plaintiff's ability to obtain counsel on his own. *Rayes v. Johnson,* 969 F.2d 700, 703 (8th Cir.) (citing *Lane,* 801 F.2d at 1043), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). A plaintiff, before seeking appointment of counsel by the court, must diligently seek out private representation. *Bradshaw v. Zoological Soc. of San Diego,* 662 F.2d 1301, 1319 (9th Cir. 1981); *Henry v. City of Detroit Manpower Dept.,* 763 F.2d 757, 760 (6th Cir.), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 604, 88 L.Ed.2d 582 (1985); *Ulmer v. Chancellor,* 691 F.2d 209, 213 (5th Cir.1982); *Jackson v. County of McLean,* 953 F.2d 1070, 1073 (7th Cir.1992); *Hodge v. Police Officers,* 802 F.2d

58, 61 (2nd Cir.1986); *Cf. Caruth*, 683 F.2d at 1048–49 & n. 7 (suggesting that diligence of plaintiff in seeking private counsel is appropriate factor to consider in determining whether to appoint counsel so long as adequate inquiry is made into plaintiff's efforts or capability to seek counsel). Plaintiff alleges that he "tried several times ... to get an attorney [ ] in the Des Moines, Iowa area" to represent him. (Filing 46.) Notwithstanding plaintiff's apparent diligence, he has failed to obtain private counsel.

 For reasons set forth more fully below, I conclude that plaintiff's failure to obtain private counsel was not the result of his indigency but rather a result of the "marketability," or lack thereof, of his claims. This "marketability" analysis,[14] which I believe to be a proper additional consideration in determining whether to appoint counsel,[15] involves an examination of the nature and circumstances of a particular case to determine whether the litigant's failure to obtain counsel is attributable to indigence, or instead to any of a number of other factors activated in the marketplace but unrelated to indigence. It requires some analysis of the market, the case, and the litigant, rather than a face-value acceptance of the market's exclusion of the litigant's claims as a true indicator of the claims' merit. Thus, the "marketability" analysis involves several steps.

The first step in the "marketability" analysis is to ask whether, realistically, there is a "market" of lawyers who practice in the legal area of the plaintiff's claims. Many indigent litigants, particularly prisoners, raise civil rights claims pursuant to 42 U.S.C. § 1983. There are relatively few private attorneys who practice in the area of civil rights. *See* Note, *Rethinking Prisoner Civil Rights Cases and the Provision of Counsel,* 17 S.Ill. U.L.J. 417 (1993) ("[t]here are virtually no lawyers in the United States who solicit prisoner civil rights litigation in the hope of earning fees through such representation"); *Coates v. Bechtel,* 811 F.2d 1045, 1049 (7th Cir.1987) (noting failure of private market to provide adequate legal services to victims of civil rights violations); *Merritt v. Faulkner,* 823 F.2d 1150, 1155 (7th Cir.1987) ("*Merritt II*") (Cudahy, J., concurring) ("I doubt that we will ever find lawyers knocking on jail cell doors for business"). Also, there are few, if any, lawyers willing to assume cases on a contingent-fee basis where the indigent plaintiff primarily seeks forms of relief other than monetary damages, such as injunctive or declaratory relief.[16] As a result, in many cases,

---

**14.** I wish to expressly distinguish the "marketability" analysis referred to in this memorandum from the "market" test which has been espoused primarily by the Honorable Richard A. Posner of the Court of Appeals for the Seventh Circuit. *See e.g. Hughes v. Joliet Correctional Ctr.,* 931 F.2d 425, 429–30 (7th Cir.1991); *Merritt v. Faulkner,* 823 F.2d 1150, 1154–55 (7th Cir.) (Posner, J., concurring), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1987) ("*Merritt II*"); *Merritt v. Faulkner,* 697 F.2d 761, 769–71 (7th Cir. 1983) (Posner, J., concurring in part and dissenting in part) ("*Merritt I*"); *McKeever v. Israel,* 689 F.2d 1315, 1323–25 (7th Cir.1982) (Posner, J., dissenting).

Under that test, if a plaintiff is unable to obtain counsel in the private market, a court must conclude that the plaintiff's legal claims are without merit and refuse to appoint counsel on that basis. The "market" test thus rests on the assumption that if a plaintiff's claim has merit, he will be able to secure counsel. *See* Jennifer Gerarda Brown, *Posner, Prisoners, and Pragmatism,* 66 Tul.L.Rev. 1117, 1118–19 (1992). I do not find that assumption to be in accord with reality. While I concede that the private market system is, for the most part, an efficient mechanism for determining which claims warrant the aid of counsel, the system is not a perfect indicator of the merits of a claim. As discussed below, many factors other than the merits of a claim may be responsible for the market's rejection of that claim. The "marketability" analysis described in this memorandum recognizes that fact. The "marketability" analysis also recognizes, however, that the market's rejection of an indigent's claim is not necessarily a result of the indigency of the plaintiff.

**15.** The Eighth Circuit has made it clear that the list of factors generally enunciated by that court in the appointment of counsel determination is "by no means an exclusive checklist." *Johnson v. Williams,* 788 F.2d 1319, 1323 (8th Cir.1986), quoting *Maclin v. Freake,* 650 F.2d 885, 888 (7th Cir.1981).(per curiam).

**16.** While such cases often have great societal benefits (i.e. changing of a governmental policy detrimental to all citizens), those benefits may not be reflected in a potential award of money damages. For example, in a civil rights case involving a prayer for only injunctive or declaratory relief, it is extremely doubtful that private attorneys would be interested in representing the

there simply is no true "market" to look to when determining whether an indigent plaintiff should be appointed counsel. In such cases, there should be no further inquiry into the "marketability" of a plaintiff's claims. Rather, the appointment of counsel should rest on those other factors commonly used in determining whether to appoint counsel. *See In re Lane, supra.*

In cases where such a "market" of lawyers is found to exist, a second question must be addressed: Does the plaintiff have adequate access to that market? This inquiry is necessary for two major reasons. First, many indigent litigants are physically unable to access private counsel regardless of the merits of their claims. This is especially true where the litigant is incarcerated. The practical ability of prisoners and other institutionalized persons to communicate with private counsel is severely restricted. *See Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 174 (2nd Cir.1989) ("[i]f the indigent plaintiff is a prison inmate ... he may have no effective means of bringing his claim to the attention of the lawyer marketplace to have its merits appraised"); *see also Rayes,* 969 F.2d at 703 (citing plaintiff's incarceration and resulting restricted access to telephone as factor in favor of appointment of counsel); *White v. Walsh,* 649 F.2d 560, 563 (8th Cir.1981) (citing plaintiff's incarceration and concomitant inability to investigate the case as factors justifying appointment of counsel). Second, there may be communication barriers of language or language skills; barriers of physical, emotional, or mental disabilities; or educational or cultural barriers that block understanding between attorney and client. The point is that the existence of lawyers "out there" in the private market does not establish their accessibility to a particular plaintiff. Where a "market" of attorneys exists but a party does not have adequate, realistic access to it, no further "marketability" inquiry is necessary because

such inquiry could not yield a reliable conclusion regarding the involvement of indigence as a factor in the litigant's failure to obtain counsel. In such situations, the appointment of counsel should be analyzed using factors from *In re Lane, supra.*[17]

If there is a market and the litigant had realistic access to it, the third step in the "marketability" analysis must be performed. That step requires an examination of the typical fee arrangements used in the particular area of the law implicated by the indigent plaintiff's complaint. Specifically, if contingent-fee or other low-cost financing arrangements are generally available in the area of law and would be feasible for the plaintiff, further examination is proper. *See Hudak v. Curators of Univ. of Mo.,* 586 F.2d 105, 106–07 (8th Cir.1978) (per curiam), *cert. denied,* 440 U.S. 985, 99 S.Ct. 1799, 60 L.Ed.2d 247 (1979) (feasibility of contingent fee arrangement may be considered in determining whether to appoint counsel); *DesRosiers v. Moran,* 949 F.2d 15, 23 (1st Cir.1991) (same); *Cooper,* 877 F.2d at 173 ("[i]f the claim is promising and relates to an injury that can be expected to produce substantial damages, a contingency lawyer will often be motivated to take it regardless whether the claimant is indigent or has property"); *Hughes,* 931 F.2d at 429–30 (claims that promise a substantial recovery if meritorious should look attractive to tort lawyers who can be hired on contingent fee basis). The absence of contingent fee arrangements or other low-cost arrangements, however, may undercut the reliability of the market's failure to provide counsel to the litigant.

Once it is determined that an accessible market exists, that the plaintiff has the ability to access that market, and that feasible fee arrangements are available, the final and most important step in the analysis must be performed. The court must determine whether the market's rejection of the party's

plaintiff because such a case carries no monetary settlement value and because attorney's fees will be recoverable only if the plaintiff, after final judicial disposition of a case, is found to be a "prevailing party" within the meaning of 42 U.S.C. § 1988.

17. As the majority of actions filed under 28 U.S.C. § 1915(d) are brought by prisoners, most of whom do not have free access to a market of attorneys, the marketability analysis will rarely proceed beyond this step. Thus, in most actions brought by indigent litigants, only the *In re Lane* factors will be used in determining whether counsel should be appointed.

claims was the result of indigency, for, as noted above, indigency is the touchstone which authorizes the court to exercise the inherent power to correct unequal access to advocacy services. There are many factors to consider when a lawyer is approached about taking a person's claims into litigation. These factors might include, but would not be limited to, the merits of the claims; the existence of precedent to support the claims; the costs of investigating the claims, handling the discovery needed to prepare the case for trial, and trying the case; the relationship of those costs to the amount of a likely recovery, discounted by the probability of recovery; the lawyer's time available to pursue the claims and the impact upon his/her other practice obligations, as well as upon those of partners or associates; the likeability of the litigant;[18] the popularity of the claims; and the potential settlement value of the claims.[19] So long as the market's rejection of the claims was based on the interplay of these and other such factors, and not on the indigency of the plaintiff, the notions of equal justice discussed above are not offended and compelling an attorney to represent that plaintiff is not necessary to the achievement of a fair and just adjudicative process.

Applying the foregoing "marketability" analysis to this case, I first conclude that there was an adequate "market" of lawyers practicing in the general area of plaintiff's claims. Plaintiff raises product liability claims, as opposed to civil rights claims under 42 U.S.C. § 1983. As such, a greater number of private attorneys were available to represent him than would be for a typical indigent litigant. *Lipscomb v. General Foods Corp.*, 615 F.Supp. 254, 257 (W.D.Wis. 1985) (contrasting personal injury claims with typical civil rights claims and noting that the former "have an economic value that makes meritorious claims attractive to law-yers without any need for judicial intervention"). The potential for joining a class action lawsuit against the tobacco companies further enhanced the "market" that was available to plaintiff. *See generally* Mark Curriden, *Hurdle Cleared for Tobacco Suit: With Class Action OK, Plaintiff's Lawyers Promise Massive Effort, Cooperation*, 81–May A.B.A.J. 22. In sum, there was a realistic "market" of lawyers who could litigate the claims raised by plaintiff.

I further conclude that plaintiff had ready access to that "market" of lawyers. Plaintiff is not incarcerated nor has he alleged any other substantial barriers[20] which might have prevented him from communicating with private attorneys. He thus had the unfettered ability to communicate with private attorneys in his immediate locale and elsewhere. Additionally, many of the attorneys who work in products liability and personal injury claims do so on a contingent fee basis. *See* Note, *supra*, 10 Rev.Litig. at 790 (discussing prevalence of contingent fee arrangements and citing other law review articles); *Merritt II*, 823 F.2d at 1155 (7th Cir. 1987) (Posner, J., concurring) ("contingent-fee contract is the usual method of financing personal-injury damage suits"). Under a contingent fee arrangement, there typically is no requirement that the plaintiff advance costs, although the plaintiff would remain liable for them ultimately. Thus, despite plaintiff's indigency, there were feasible fee arrangements available to plaintiff.

The foregoing factors indicate that, unlike most cases initiated by indigent litigants, there was a "market" of private attorneys for plaintiff's claims and that, unlike most indigent litigants, plaintiff had open access to that market and has, in fact, accessed that market, albeit unsuccessfully. It thus is

---

18. While even the most despicable character is, by rights, entitled to the same access to the courts to voice his grievances as is the most attractive, wealthy, and urbane individual, the private market may exclude the former from access because of this intangible factor. It is not inappropriate for a court to consider this factor in determining whether the plaintiff's personal characteristics might have been a force behind the market's rejection of his claims.

19. As the list of factors indicates, a conclusion that a plaintiff's claims are not "marketable" does not necessarily reflect negatively on the ultimate merits of that plaintiff's claims, as that is but one factor involved in the "marketability" analysis.

20. While plaintiff has alleged health problems, he presents no evidence indicating that these problems would inhibit him from seeking out counsel either in person or via telephone or mail.

proper to determine whether that market's rejection of plaintiff's claims was the result of his indigency.

I conclude that it was not. The mere existence of indigency as a condition of the plaintiff did not prevent him from suggesting to lawyers that they consider his claims. Rather, he has had the same opportunity as middle- or upper-class plaintiffs to subject his claims to the scrutiny of tort attorneys. That this "market" of attorneys has thus far rejected his claims is the result of factors unrelated to his indigency. Primary among these factors is undoubtedly the enormous cost of litigating claims against tobacco companies. *See* Robert L. Rabin, *A Sociolegal History of the Tobacco Tort Litigation,* 44 Stan.L.Rev. 853, 857 (1992) (noting that tobacco litigation often requires exorbitant expenses for expert witnesses and travel). An additional factor is the tobacco companies' "no compromise" strategy which eliminates any potential settlement value for claims brought against those entities.[21] *Id.*

Plaintiff asserts that most of the attorneys he contacted requested payment of a retainer which he was unable to afford. (Filing 46.) However, due to the enormous costs involved in this type of litigation and the unlikelihood of settlement, the amount of money required for an adequate retainer would likely be so great that even a middle-class or upper-middle-class citizen would be unable to afford it. As such, the rejection of plaintiff's claims was not based on his indigency, but rather on marketability factors such as the expenses involved and the unlikelihood of settlement.

*See Cooper,* 877 F.2d at 173 ("[t]he poverty of the claimant may often be irrelevant to his ability to secure counsel").

Because it is the lack of marketability of his claims, as opposed to his indigency, which has prevented plaintiff from obtaining counsel, the notions of equal justice discussed above have not been offended. As such, it is not reasonably necessary to the administration of justice for this court to compel Metcalf to represent plaintiff. *See id.* ("[a] claim that could not command a lawyer's acceptance if possessed by an employed middle-class property owner should not command a *pro bono* lawyer"); *Lipscomb,* 615 F.Supp. at 257 (court intervention necessary only if inability to obtain private counsel is caused by the plaintiff's status as opposed to "a negative evaluation of the economic value of the claim"). Accordingly, I shall not exercise this court's inherent authority to do so.[22]

### IT THEREFORE IS ORDERED:

1. The motion for reconsideration and vacation (filing 50) is granted and my previous order of appointment (filing 49) is hereby vacated.

2. The clerk shall file all briefs submitted in support of or in opposition to the motion for reconsideration and vacation.

3. Plaintiff is hereby given 60 days from the date of this order in which to either: (1) obtain the services of substitute counsel and have that attorney file an appearance on his behalf; or (2) indicate, by pleading, that he will proceed in this case without counsel. If

21. It has been stated that while more than 300 lawsuits have been filed against tobacco companies since 1954, the defendants have never paid out a single jury or settlement award. Mark Curriden, *Hurdle Cleared for Tobacco Suit: With Class Action OK, Plaintiff's Lawyers Promise Massive Effort, Cooperation,* 81–May A.B.A.J. 22; *see also* Robert L. Rabin, *A Sociolegal History of the Tobacco Tort Litigation,* 44 Stan.L.Rev. 853, 857 (1992) (noting that "after thirty-five years of litigation, the tobacco industry could still maintain the notable claim that it had not paid out a cent in tort awards").

22. Because I decline to exercise the court's inherent authority, I need not address Metcalf's contention that the exercise of that authority in this case would contravene the Fifth and Thirteenth Amendments of the Constitution. Howev-

er, the majority of courts which have addressed those issues have found no constitutional violations. *See Williamson v. Vardeman,* 674 F.2d 1211 (8th Cir.1982) (collecting federal and state cases); *In re Amendments to Rules Regulating the Florida Bar,* 573 So.2d 800, 805 & n. 11 (citing federal appellate cases); *Bradshaw v. U.S. Dist. Court,* 742 F.2d 515, 517 n. 2 (9th Cir.1984); *Family Div. Trial Lawyers v. Moultrie,* 725 F.2d 695, 712 (D.C.Cir.1984); *United States v. Dillon,* 346 F.2d 633 (9th Cir.1964), *cert. denied,* 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1965); *see also* Note, *The Constitutionality of Compulsory Attorney Service: The Void Left by Mallard,* 68 North Carolina L.Rev. 575, 579 (1990) (collecting cases). To the extent these constitutional claims attack the very existence of the inherent power itself, I also reject them.

neither of these actions is taken within 60 days of this order, this case will be subject to dismissal.

## APPENDIX

### United States Court of Appeals

### FOR THE EIGHTH CIRCUIT

No. 89–2419

In Re: William W. Hollander, Petitioner.

Petition for Writ of Mandamus.

Filed:

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and FAGG, Circuit Judge.

### ORDER

Petitioner complains of his appointment by the District Court to represent an indigent plaintiff in a civil rights action brought pursuant to 42 U.S.C. § 1983. Petitioner relies upon the decision of the United States Supreme Court in *Mallard v. United States District Court for the Southern District of Iowa*, 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). In that case, the Supreme Court held that 28 U.S.C. § 1915(d) merely authorizes courts to request attorneys to represent indigent litigants in civil cases and does not permit courts to require such representation.

We note, however, that the District Court's order of August 15, 1989, which is that court's most recent order in this matter, requires petitioner to represent the indigent plaintiff pursuant to the court's inherent powers. We further note that in *Mallard* the Supreme Court expressly limited its holding to an interpretation of § 1915(d). The Court declined to:

express an opinion on the question whether the federal courts possess inherent authority to require lawyers to serve. Although respondent and its *amici* urge us to affirm the Court of Appeals' judgment on the ground that the federal courts do have such authority, the District Court did not invoke its inherent power in its opinion

below, and the Court of Appeals did not offer this ground for denying Mallard's application for a writ of mandamus. We therefore leave that issue for another day.

490 U.S. at 310, 109 S.Ct. at 1823.

Because we believe that the District Court has acted properly within its inherent powers, the petition for writ of mandamus is denied.