**Michael McCASLIN, By his Guardian ad litem, Bonnie McCASLIN, Plaintiff,**

v.

**Dale RADCLIFF, et al., Defendants.**

No. 4:CV93–3028.

United States District Court,
D. Nebraska.

July 25, 1996.

---

**250**

Michael McCaslin by Bonnie McCaslin, Plaintiff Pro se.

Brenda S. Spilker, Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

With 18 prospective jurors waiting, the plaintiff Michael McCaslin and his mother and guardian ad litem Bonnie McCaslin refused to proceed to trial at the time and place set for trial. They took that position after being advised that Bonnie McCaslin, who is not a lawyer, would not be permitted to act as a lawyer for her son during the jury trial and after having also been advised that the failure to proceed would result in a judgment of dismissal with prejudice.

Because the plaintiff and his guardian ad litem elected not to proceed to trial, I will enter judgment of dismissal with prejudice pursuant to Federal Rule of Civil Procedure 41(b). The reasons for my decision are set forth in the following portions of this memorandum.

### I.

This suit was filed in January of 1993. It is one of two cases that I have on my docket that is more than three years old.

Essentially the case involves the plaintiff's claim that in 1989 Dale Radcliff, then a deputy sheriff, unlawfully seized, searched, and arrested Michael McCaslin. Plaintiff's mother prepared the complaint that originated this lawsuit (and six other lawsuits), but Michael McCaslin also signed the complaint. (Filing 1.)

Michael McCaslin claims to be "emotionally and mentally handicapped." (Filing 3 at 6.) At the time McCaslin filed this action he was 25 years old. (Filing 19 ¶ 1.) He claimed to be indigent. (Filing 2 ¶ 17.) He also claimed to receive social security disability and supplemental social security payments in the sum of $442.00 per month. (*Id.*)

Finding McCaslin was entitled to proceed in forma pauperis, Magistrate Judge David L. Piester appointed counsel to represent Plaintiff in this and the six other cases he had filed. (Filing 3 at 6.) Judge Piester specifically requested that appointed counsel investigate whether the plaintiff was competent to proceed within the meaning of Federal Rule of Civil Procedure 17. (*Id.*) Counsel

was directed to file an amended complaint. (*Id.* at 7.)

The first lawyer appointed investigated the matter and filed a motion (filing 6, filed under seal[1]) to withdraw with supporting affidavits (filings 6 and 13, filed under seal). The lawyer advised Judge Piester and the McCaslins that after carefully investigating the facts and law (including interviews with the plaintiff and his mother) counsel could not file an amended complaint as directed by the court because to do so would violate the provisions of Federal Rule of Civil Procedure 11 (filings 6 and 13, filed under seal).

In particular the lawyer indicated that the claims against Dale Radcliff were not factually supported (filing 6 ¶ 7, filed under seal, and filing 13 ¶¶ 4–6, filed under seal). The affidavits described in some detail the investigation the lawyer had conducted and why he concluded that he could not represent the plaintiff consistent with Rule 11. (*Id.*)

After carefully reviewing the information, Judge Piester granted the first lawyer leave to withdraw on February 18, 1994. (Filing 15.) Judge Piester then ordered the plaintiff to file an amended complaint without the aid of a lawyer. (Filing 18.)

The plaintiff, in a pleading signed by his mother, submitted an amended complaint on June 24, 1994. (Filing 19.) On July 13, 1994, liberally construing the amended complaint, Judge Piester determined that the amended complaint stated claims against Dale Radcliff, but Judge Piester also determined that the amended complaint failed to state a claim against York County, Nebraska. (Filing 20.) Judge Piester recommended dismissal of the case as against York County, Nebraska. (*Id.*)

At the same time Judge Piester again appointed counsel for Plaintiff. (*Id.*) Additionally, Judge Piester, noting Plaintiff was an adult and therefore of sufficient age to proceed under Rule 17, but also noting that Plaintiff claimed a mental disability, appointed Bonnie McCaslin as Plaintiff's guardian ad litem. (*Id.*)

No objections were filed to the report and recommendation regarding the dismissal of York County, Nebraska. On August 8, 1994, after de novo review, I adopted the report and recommendation and dismissed York County, Nebraska as a defendant. (Filing 21.)

On December 27, 1994 the second lawyer appointed to represent Plaintiff moved to withdraw. (Filing 24.) Once again the lawyer supported the motion by sealed affidavit (filing 28, filed under seal).

Essentially, the lawyer represented that after a thorough investigation, including interviews of the plaintiff, his mother, and various witnesses and review of other evidence, counsel was "unable to pursue this case on behalf of the Plaintiff on the grounds that in my opinion it would violate the requirements and mandates of Rule 11(b)(3) of the Federal Rules of Civil Procedure." (*Id.* ¶¶ 4–6.) The plaintiff responded by requesting the appointment of yet a third lawyer. (Filing 29.) On January 19, 1995, Judge Piester granted the motion to withdraw, but denied the motion for appointment of a third lawyer. (Filing 30.)

The case then languished without much activity until June 28, 1995 when I entered an order to show cause why the case should not be dismissed for failure to serve summons within 120 days under Federal Rule of Civil Procedure 4(m). (Filing 31.) Bonnie McCaslin responded essentially stating that the plaintiff was "unable to comply because of her lack of legal expertise." (Filing 32.) On July 20, 1995, I gave the plaintiff additional time to comply, provided the plaintiff with a copy of Federal Rule of Civil Procedure 4, and directed the plaintiff's attention to a pertinent portion of the Rule. (Filing 33 at 1 & nn. 1 and 2).

Summons was then served. (Filing 34.) Counsel for the defendant entered their appearance on August 17, 1995. (Filing 35.)

The case then proceeded through the discovery and motion stages. During this time Plaintiff represented himself with the aid of his mother, the guardian ad litem. For ex-

---

**1.** All sealed filings referred to in this memorandum and order were mailed to Plaintiff and his mother, but they were not provided to the defendants or their counsel.

ample, pleadings submitted to the court during this time were often signed by Bonnie McCaslin over the heading "Michael McCaslin by his Guardian ad litem Bonnie McCaslin." (e.g., Filing 32.)

However, Michael McCaslin did personally sign an affidavit under oath which set forth in three pages of coherent factual detail what Michael McCaslin claimed had happened. (Filing 65.) The affidavit was notarized by someone other than Bonnie McCaslin. (*Id.*) This affidavit was submitted in opposition to a motion for summary judgment. In fact two motions for summary judgment were filed. (Filings 51 and 75.)

The first motion for summary judgment was based upon the defense of qualified immunity. (Filing 51.) In regard to that motion I granted the motion insofar as the *Terry* stop of Plaintiff was concerned, but I denied the motion as to ensuing events because the facts were in dispute as to what Radcliff knew and what he did after the *Terry* stop took place. (Filing 72.) These facts became disputed because of the affidavit personally signed by Michael McCaslin which I have described earlier. (*Id.* at 3 & n. 1.)

The second motion for summary judgment was based upon the statute of limitations. (Filing 75.) Although the statute of limitations had clearly run if it was not tolled, I denied that motion because I believed there was a factual dispute as to the severity of plaintiff's alleged disability and a sufficiently severe disability would toll the statute of limitations. (Filing 85.)

On February 12, 1996 the plaintiff by his guardian ad litem submitted a motion asking again for appointment of counsel. (Filing 59.) In that motion Plaintiff admitted that "Plaintiff believes that there is no way that he can successfully proceed with this case without this appointment...." (*Id.*)

Judge Piester considered the motion and denied it on February 16, 1996. In a sealed opinion Judge Piester first noted that two different lawyers had concluded "following a thorough investigation of the plaintiff's claims and applicable law" that "the plaintiff's claims were without merit." (Filing 60,

filed under seal.) Judge Piester then found that to "appoint a third [lawyer] would merely subject appointed counsel to sanctions under Rule 11, or alternatively begin a cycle of wasteful investigations and motions to withdraw for the same reasons" the earlier lawyers had cited. (*Id.*) The judge could not "in good conscience do so." (*Id.*)

Judge Piester warned the plaintiff that the provisions of Rule 11 pertained to unrepresented parties, and specifically advised the plaintiff that he "must be cautious about proceeding further with this case, for sanctions are available." (*Id.*) Judge Piester added that the decision to proceed "is a decision for plaintiff to make" and "I merely advise plaintiff to proceed with care." (*Id.*)

On the same day that Judge Piester issued the warning, McCaslin failed to show up for a properly noticed deposition. The defendant was therefore required to file a motion to compel. (Filings 61 and 62.) Because of this failure the defendant was also required to move to amend the progression order filed in this case. (Filing 66.)

On February 28, 1996 the plaintiff filed a motion for rehearing. (Filing 64.) In that motion Plaintiff essentially asked that counsel again be appointed noting that it was "completely impossible" to expect Plaintiff to "try this case before the Court" without the appointment of counsel because of the plaintiff's alleged disability. The motion further recited that the guardian ad litem had tried to hire counsel but had been unable to do so.

On March 5, 1996 Judge Piester took up the pending motions. (Filing 69.) The judge first denied the motion for appointment of counsel stating that the reasons previously given for denying similar motions were still applicable. Moreover, Judge Piester found that the "statements of plaintiff's prior counsel" demonstrated that appointment of counsel should be denied for the additional reasons articulated in *Bothwell v. Republic Tobacco Co.*, 912 F.Supp. 1221 (D.Neb.1995) (court possessed inherent authority to compel a lawyer to represent an indigent plaintiff in a civil rights case over the objection of the lawyer, but the court would decline to do so where plaintiff's inability to obtain private counsel was to due to

lack of marketability of his claims rather than indigence).

Secondly, Judge Piester granted the motion to compel. In the order Judge Piester described Plaintiff's conduct as "totally improper" and the judge imposed sanctions under Federal Rule of Civil Procedure 37(d) in the form of mileage expenses for defendant's counsel, court reporter fees and similar expenses. Judge Piester did not, however, impose attorney fees as a part of the sanctions.

Finally, Judge Piester granted the motion to extend the progression order. Consequently, Judge Piester rescheduled the progression of this case. (Filing 70.) As a result of the rescheduling the case was continued from a May 1996 trial date to a July 1996 trial date. (*Compare* filing 57 *with* filing 70.)

The case was submitted to Judge Piester for a pretrial conference on June 14, 1996. Bonnie McCaslin signed the pretrial conference order. (Filing 83.) The only exhibit noted by Plaintiff was an affidavit of Plaintiff. (*Id.,* exhibit list.) The only witnesses listed by the plaintiff were the plaintiff and his mother. (*Id.* ¶ F1, at 5.) In that order Judge Piester directed the plaintiff to specify his damages within 7 days by serving defense counsel and the court with a specification of damages. (*Id.* at 4 n.*.) The parties further agreed that it would be a controverted issue "whether Bonnie McCaslin is able to act as the plaintiff's lawyer during the trial." (*Id.* ¶ E9, at 5.)

On June 17, 1996 I set the case for trial to start on Tuesday, July 23, 1996 and entered an order notifying the parties. (Filing 84.) Since this case was the third case set for trial that day the courtroom deputy who assists me in scheduling conferred with the parties as the trial date drew near. The deputy told the parties during the week preceding the scheduled trial date that this case was likely to be tried. Because Dale Radcliff, who had now become the Sheriff of York County, Nebraska, had to appear as a witness in another case in York, Nebraska (some 50 miles to the west) on the day trial in this case was scheduled to commence, the parties were informed that the jury would be picked in the afternoon rather than the morning.

The plaintiff never requested either orally or in writing a continuance of trial between the time of the June 14th pretrial conference and the July 23rd trial. Moreover, no motions were submitted to me requesting the appointment of counsel.

On July 19, 1996 the defendant served his trial brief. In that brief the defendant made clear that he would object to Bonnie McCaslin serving in the role of counsel for Michael McCaslin since Bonnie McCaslin was not a lawyer. On June 22, 1996 the defendant filed a motion in limine requesting that the court prohibit Bonnie McCaslin from serving as counsel in this case because such representation amounted to the unauthorized practice of law. (Filing 87.)

Over the noon hour on Tuesday, July 23, 1996 I conducted an orientation of 18 prospective jurors. After the jurors had been oriented I proceeded to my chambers to confer with Michael McCaslin, Bonnie McCaslin, and defense counsel. It is my regular practice to confer with counsel or unrepresented parties immediately prior to trial in chambers in order to insure that the case will go as smoothly as possible. It is also my normal practice to have my court reporter present. And it is not unusual to have a court security officer present when one of the parties appears pro se.

Immediately prior to the conference beginning Ms. McCaslin stated that her son was in the clerk's office filing papers. I directed her to find her son and return to my chambers. The record reflects that at 1:05 p.m. on July 23, 1996 a specification of damages was filed. (Filing 90.[2]) This was the specification which Judge Piester had directed be filed no later than June 21, 1996.

In that specification Bonnie McCaslin represented, among other things, that attorney Bob Broom had been paid to review this case to determine "if he would handle the case." Bonnie McCaslin further represented that she had mailed copies of records to Mr.

---

**2.** At the same time Bonnie McCaslin also filed a motion which essentially requested that the court amend the exhibit list to add a letter about her name. (Filing 89.)

Broom for review. I observe that Mr. Broom[3] is a very well regarded trial lawyer with substantial experience representing indigent people in civil rights cases. This damage specification further revealed that Bonnie McCaslin had contacted over 35 other lawyers to determine "if they would handle case." Obviously, none of these lawyers ever entered their appearance in this case.

At the conference with Michael McCaslin, Bonnie McCaslin, and defense counsel (and court employees) I first took up the motion in limine. Ms. McCaslin told me, among other things, that she had consulted numerous lawyers, as evidenced by the damage specification that had been filed that date, "and none of them would take the case." (Filing 91, Tr. 4:1–5.) After hearing arguments I informed Bonnie McCaslin and the plaintiff that I would sustain the motion. (*Id.* at 5:3–9.)

Ms. McCaslin remarked that defense counsel had informed the magistrate judge and Ms. McCaslin that defense counsel intended to file a motion seeking to prohibit Ms. McCaslin from serving as a lawyer in the trial of the case. (*Id.* at 5:14–15.) In fact, the pretrial conference order recited that it would be a controverted issue whether Bonnie McCaslin could "act as the plaintiff's lawyer during the trial." (Filing 83 ¶ E9, at 5.)

Ms. McCaslin stated that she asked Judge Piester "is Michael going to have to be alone, and he said no, that would not happen." (Filing 91, Tr. 5:14–17.) Ms. McCaslin also stated that Judge Piester told her that he believed I would appoint counsel for Michael McCaslin. (*Id.* at 5:17–19.) There is no record of any such statements by Judge Piester, and at this point it is important to digress.

Judge Piester provides me with a "pretrial conference checklist" after he conducts pretrial conferences. This checklist is for internal use of the court only, and the parties are not aware of the checklist and they are not provided with copies of it. In these checklists Judge Piester routinely informs me, among other things, of any special matters of which I should be aware. He frequently gives me his advice on such special matters.

In this case the checklist made no mention of appointment of counsel. In fact, the checklist specifically advised me that this was a pro se case. Nothing is mentioned about the need or propriety of appointing counsel for McCaslin in this case.

Consequently, I find Ms. McCaslin's statements which she attributes to Judge Piester regarding the appointment of counsel to be unworthy of belief. Indeed, given the fact that the judge had himself refused to appoint substitute counsel on numerous prior occasions I find it incredible to believe that Judge Piester would have suggested that I would (or should) appoint counsel when he would not.

I now return to the conference with Ms. McCaslin, Michael McCaslin, and defense counsel. After listening to Ms. McCaslin's statements about Judge Piester, I informed Bonnie McCaslin and the plaintiff that they had three alternatives.

The first alternative was to proceed to trial and "Mr. McCaslin can proceed to represent himself." (*Id.* at 5:24–25.) I further advised that in such an event I would allow Bonnie McCaslin to sit at counsel table and I would allow her to "confer privately and quietly with" the plaintiff. (*Id.* at 6:1–5.) I explained to Ms. McCaslin that my ruling meant "you can't make statements to the Court or ask witnesses questions or present evidence, but you can sit at counsel table as guardian ad litem and assist your son if you would like to do that." (*Id.*)

I then informed the plaintiff and his guardian ad litem that the second alternative was to move for continuance in order to try to hire a lawyer. (*Id.* at 6:6–7.) I informed the plaintiff and his mother that I would grant such a motion for the sole purpose of allowing them additional time to try to hire a lawyer, but if I granted such a continuance motion I would also impose the following sanctions: (1) payment of fees and expenses

---

**3.** Mr. Broom served as the chairman of the Civil Justice Reform Act Advisory Committee for this court.

for the defense in the sum of $2,500; (2) payment of the costs incurred by the federal government in bringing the prospective jurors to the court in the sum $1,227; and (3) dismissal of this case with prejudice if the monetary sanctions were not paid by August 6, 1996. (*Id.* at 6:8–16.)

Finally, I advised Michael and Bonnie McCaslin that they could simply "not proceed to trial today, in which event, I would dismiss this case with prejudice, and you could take whatever appeal, if any, that you have to the Court of Appeals." (*Id.* 6:17–21.)

After the plaintiff and Ms. McCaslin talked privately, Ms. McCaslin told me, and her son explicitly agreed, that they chose the third alternative I had outlined. (*Id.* at 7:14–8:17.) Ms. McCaslin observed that the plaintiff had the ability to "tell his story" but doubted whether he had the ability to ask witnesses questions and therefore "he wants [alternative] three." (*Id.* at 7:16–19.) I then specifically inquired of Michael McCaslin whether he wanted to ask me any questions, and he responded: "None that I can think of." (*Id.* at 8:18–20.)

I then asked both Bonnie McCaslin and Michael McCaslin separately whether "you're telling me you do not wish to proceed to trial today?" (*Id.* at 8:24–25; 9:3–5.) Both people separately confirmed that such was the course of action they desired to take. (*Id.* at 9:1–6.) I then inquired of Michael McCaslin whether he understood that "I will dismiss your lawsuit with prejudice as a result of your failure to prosecute this action," and he answered in the affirmative. (*Id.* 9:7–11.)

Bonnie McCaslin then asked me whether I could "think of any reason why the Court [of Appeals] would refuse to even entertain the appeal," and I answered that it would be improper for me to give her such advice. (*Id.* at 9:13–20.) I then stated that upon entry of judgment "your son, like any other litigant, would have the right to file a notice of appeal, and then it would be handled in the normal course of things." (*Id.* at 9:24–10:2.)

The conference then ended. I directed the courtroom deputy to provide the McCaslins with a copy of Federal Rule of Appellate Procedure 4 pertaining to appeals in civil cases. The courtroom deputy confirms that she did so. In this regard I note that the McCaslins are no strangers to the federal appellate process. *See e.g. Michael McCaslin by his guardian ad litem, Bonnie McCaslin v. John Doe,* 72 F.3d 133 (TABLE), 1995 WL 716775 (8th Cir.1995) (affirming dismissal of three cases filed by Michael McCaslin, by Bonnie McCaslin his guardian ad litem, after appointed counsel withdrew); *McCaslin v. First National Bank of York,* 43 F.3d 1182 (8th Cir.1994) (as a prison inmate Bonnie McCaslin filed 19 cases on January 4, 1993 (three days before this case was filed) and successfully appealed this court's dismissal of five of those cases for failure to pay a partial filing fee).

## II.

I briefly discuss the five legal principles that have governed my actions in this case. I then apply those principles to this case.

### A.

■ First, pursuant to Federal Rule of Civil Procedure 41(b) a party who refuses to prosecute a civil case may suffer dismissal of his or her case with prejudice. *See e.g., American Inmate Paralegal Assoc. v. Cline,* 859 F.2d 59, 61 (8th Cir.) *cert. denied* 488 U.S. 996, 109 S.Ct. 565, 102 L.Ed.2d 590 (1988) (affirming dismissal with prejudice of case brought by unrepresented prison inmates where inmates failed to comply with court order to amend complaint).

■ Second, "[p]ro se litigants are not excused from complying with court orders or substantive and procedural law." *Id.* at 61.

■ Third, a pro se litigant has no right to have a person who is not a lawyer act in the capacity of a lawyer for the litigant. *See e.g., Knoefler v. United Bank of Bismark,* 20 F.3d 347, 348 (8th Cir.1994) (nonlawyer trustee could not represent trust); *Meeker v. Kercher,* 782 F.2d 153, 154 (10th Cir.1986) (father of minor children could not represent children who were also plaintiffs); 28 U.S.C. § 1654. In fact it has been held to be plain error to allow a non-lawyer guardian, such as parent, to represent the ward as a lawyer in

the jury trial of a civil case even when the guardian was a "well-educated economist." *Osei–Afriyie v. Medical College of Pennsylvania,* 937 F.2d 876, 882–83 (3rd Cir.1991). In this regard I point out that the unauthorized practice of law is a crime in the State of Nebraska. Neb.Rev.Stat. § 7–101 (Reissue 1991).

■ Fourth, under Federal Rule of Civil Procedure 17(c) the duties of a lawyer for a party and a guardian ad litem for a party are different, and it is not the function of the guardian ad litem to serve as a lawyer. *See e.g., Noe v. True,* 507 F.2d 9, 12 (6th Cir. 1974) (applying Rule 17(c) the court held it was error to refuse to appoint a guardian ad litem for minor plaintiff seeking an abortion even though plaintiff was represented by counsel because the duties of the guardian ad litem involve "a role not ordinarily contemplated by the simple attorney-client relationship.") As the court observed in *Noe,* a guardian ad litem is not appointed to serve as a lawyer, rather the guardian ad litem is appointed " 'to act for the [ward] in the cause, with authority to engage counsel, file suit, and to prosecute, control and direct the litigation.' " *Id.* (citing *Fong Sik Leung v. Dulles,* 226 F.2d 74, 82 (9th Cir.1955)).

■ Fifth, in deciding whether to dismiss a case under Rule 41(b), when a party otherwise protected by Rule 17(c) is before the court, the test is whether there is a clear record of delay or contumacious conduct by the party against whom dismissal is ordered. *M.S. v. Wermers,* 557 F.2d 170, 175 (8th Cir.1977) (reversing Rule 41(b) dismissal of minor's case because she failed to obey court order that required her to give notice to her parents of a lawsuit which sought contraceptives).

### B.

■ This case is replete with delay caused by the plaintiff and the guardian ad litem. It is also littered with refusals by the plaintiff and the guardian ad litem to abide by perfectly valid court orders. The following five examples will illustrate these points.

First, this case (which relates to events which took place in 1989) is over three years old because the plaintiff and the guardian ad litem refused to accept the advice of two separate lawyers that the case had no merit.

Second, the plaintiff and guardian ad litem failed to serve summons within the time required by Rule 4.

Third, the plaintiff and the guardian ad litem failed to attend a properly noticed deposition causing this case to be rescheduled, causing the trial to be delayed for two months, and causing Judge Piester to impose sanctions.

Fourth, the plaintiff and the guardian ad litem failed to serve the required statement of damages in accordance with Judge Piester's order, and when it was served it was served nearly a month late and only minutes before trial was scheduled to begin.

Fifth, and most important, despite the facts that: (1) the plaintiff and the guardian ad litem were specifically and repeatedly advised that substitute counsel would not be appointed because two appointed lawyers had concluded that the case had no merit; (2) attorney Broom, who was apparently paid to review the case, did not take the case; (3) over 35 other lawyers refused to take the case; (4) Plaintiff and the guardian ad litem were specifically advised by Judge Piester that this case probably lacked merit and that sanctions could be imposed if Plaintiff proceeded with this litigation; (5) the plaintiff and the guardian ad litem knew at the time of the pretrial conference that defense counsel would seek to preclude Ms. McCaslin from serving as a lawyer during the trial of the case; and (6) the plaintiff and the guardian ad litem were given nearly a month's advance notice of the precise date of trial, the plaintiff and Ms. McCaslin came to court on the day of trial unprepared to do anything but complain that the court would not appoint a third lawyer or allow Ms. McCaslin to parade about the courtroom as if she were a lawyer.

Accordingly, I find and conclude that there is more than ample reason to dismiss this case with prejudice. Before concluding, however, two observations are in order.

First, even though Michael McCaslin's case was probably lacking in merit, I did not

deny Michael McCaslin his day in court. I stressed to him and his mother that the case could proceed to trial, with the guardian ad litem sitting at counsel table so as to be able to confer privately with the plaintiff.

Even granting the fact that Michael McCaslin may have a mental disability[4], according to his mother and guardian ad litem Plaintiff had the ability to "tell his story." (Filing 91, Tr. 7:16–17.) Bonnie McCaslin's statement was certainly consistent with my observations of Michael McCaslin. Her statement was also consistent with my review of the affidavit, signed under oath before a notary, which the plaintiff submitted in opposition to the motion for summary judgment.

Still further, the only witnesses listed by Plaintiff at the time of the pretrial conference were the plaintiff and his mother. The only plaintiff's exhibit listed was an affidavit of Plaintiff. Simply stated, there was nothing difficult about Plaintiff's case.

In sum, the plaintiff and the guardian ad litem had no well-founded reason why the plaintiff could not simply "tell his story" as he admittedly had the ability to do. The refusal to proceed to trial was another variant of the practice and pattern of delay and refusal to follow court orders that the plaintiff and his mother have engaged in for more than three years.

Second, while this court must and does have a special concern for the indigent and the infirm, that concern must not be allowed to trump the court's concomitant responsibility to provide justice to Dale Radcliff. Mr. Radcliff, a busy public official, has been forced to defend this apparently frivolous litigation because of the cautious approach this court has taken when dealing with the plaintiff and the guardian. Mr. Radcliff has a right to be protected from the continued machinations of the plaintiff and his mother.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document for Defen-

dants and against Plaintiff providing that Plaintiff shall take nothing and this case is dismissed with prejudice.[5]

---

4. The severity of the disability is very questionable. As a matter of fact, had I been reviewing the motion for summary judgment as the trier of fact it is likely that I would have found that the statute of limitations was not tolled because McCaslin's disability was not sufficiently severe.

5. Plaintiff and the guardian ad litem are notified that if they wish to appeal they should file a notice of appeal in the court file within 30 days of the entry of judgment.